[Cite as *State v. Fletcher*, 2024-Ohio-5117.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. Nos. 2023-CA-23; 2023-CA-24 |
| | : | |
| v. | : | Trial Court Case Nos. 22CR00244; |
| | : | 22CR00306 |
| ASHLEE FLETCHER | : | |
| | : | (Criminal Appeal from Common Pleas |
| Appellant | : | Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on October 25, 2024

. . . . . . . . . . .

LUCAS WILDER, Attorney for Appellant

R. KELLY ORMSBY, III & DEBORAH S. QUIGLEY, Attorneys for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this consolidated appeal, Ashlee Fletcher appeals from her felony convictions in two separate cases that were tried by juries in the Darke County Court of Common Pleas. In Darke C.P. No. 22CR00244, Fletcher appeals her convictions for

single counts of gross abuse of a corpse and tampering with evidence. In Darke C.P. No. 22CR00306, Fletcher appeals her convictions for single counts of endangering children and involuntary manslaughter. For the reasons outlined in this opinion, Fletcher's convictions for gross abuse of a corpse and tampering with evidence in Case No. 22CR00244 will be affirmed. However, Fletcher's convictions for endangering children and involuntary manslaughter in Case No. 22CR00306 will be reversed, and that case will be remanded to the trial court for a new trial. For purposes of clarity, we will review each of Fletcher's cases separately, beginning with Case No. 22CR00244.

I.      CASE NO. 22CR00244 - GROSS ABUSE OF A CORPSE AND TAMPERING WITH EVIDENCE

**Facts and Course of Proceedings**

{¶ 2} On September 8, 2022, a Darke County grand jury returned an indictment charging Fletcher with one count of gross abuse of a corpse in violation of R.C. 2927.01(B),[1] a fifth-degree felony, and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. These charges stemmed from allegations that Fletcher's paramour, Dean Baker, had murdered his friend Corey Fleming, and that Fletcher, who knew about the incident, concealed and removed evidence of the murder

---

[1] Throughout the trial court proceedings and in their appellate briefs, the parties refer to a violation of R.C. 2927.01(B) as "abuse of a corpse." Section (C) of R.C. 2927.01, however, states that: "Whoever violates division (B) of [R.C. 2927.01] is guilty of *gross* abuse of a corpse, a felony of the fifth degree." (Emphasis added.) In contrast, "abuse of a corpse" is a second-degree misdemeanor offense that is a violation of R.C. 2927.01(A). R.C. 2927.01(C). Because there is no dispute that Fletcher was charged and convicted for violating section (B) of R.C. 2927.01, we will refer to the offense as "gross abuse of a corpse."

and assisted Baker with disposing of Fleming's body.

{¶ 3} Fletcher pled not guilty to the indicted charges and the matter proceeded to a jury trial. During trial, the State presented 15 witnesses and several hundred exhibits. In contrast, the defense presented no witnesses or exhibits but relied on its cross-examination of the State's witnesses. To help expedite the trial, the parties stipulated that, on or about August 7 or 8, 2022, Baker murdered Fleming at Baker's residence on Martin Street in the city of Greenville, Darke County, Ohio. Given the stipulation, the trial court instructed the parties to limit the evidence pertaining to Baker's murder of Fleming and instead to focus on presenting evidence that related to Fletcher's charges for gross abuse of a corpse and tampering with evidence. The following is a summary of the relevant information that was presented at trial.

*Fletcher and Baker's Relationship*

{¶ 4} At the time Baker murdered Fleming, Fletcher and Baker were having an affair with each other. Fletcher was married to James Fletcher; however, Fletcher and her husband were separated and not living together. In December 2021, Fletcher moved out of their family home and into a duplex on Warren Street in Greenville. Baker was also married, but he and his wife, Brie Baker, were not separated. Baker and Brie lived together in a residence on Martin Street in Greenville, which was just a few blocks away from Fletcher's duplex. Fletcher babysat Brie's children often and was Brie's best friend. Brie worked as a late-shift security guard from 10 p.m. to 10 a.m. or from 2 a.m. to 2 p.m. and was often working while Baker and Fletcher were together. Fletcher's across-the-

street neighbors, Angela Bowman and David Stump, would see Baker at Fletcher's residence at all hours of the day and night. Bowman was aware that Baker was Fletcher's boyfriend.

*Cal-Maine*

**{¶ 5}** At all relevant times, Baker was an outside maintenance employee at Cal-Maine Foods ("Cal-Maine") in the village of Rossburg, Darke County, Ohio. Cal-Maine was the largest producer and distributor of eggs in the country. It had approximately 40 locations across 14 states. The Rossburg location was a large, fenced-in complex with multiple barns that held roughly 100,000 birds. In addition to the multiple bird barns, there were other barns on the property that were used for outdoor maintenance purposes and for storing equipment. Baker's primary workstations were in a white storage barn and gray storage barn on the property. Baker worked from 7 a.m. to 3 or 4 p.m. Baker's main role was to be outside all the time working on fan shutters, feed bins, or just generally maintaining the grounds. Only employees like Baker were supposed to be in the complex, which was biosecure. Fletcher worked part-time at Cal-Maine for a couple of months in 2018; however, she had not worked at Cal-Maine since that time.

*Fleming's Disappearance and the Search of Baker's Residence*

**{¶ 6}** During the days leading up to his death, Fleming was residing in a detached, single car garage at Baker's residence on Martin Street. Baker's wife, Brie, last saw Fleming on the evening of August 7, 2022. After that day, Baker told Brie that he had

kicked Fleming out of their garage because Fleming was using drugs. Ten days later, on August 18, 2022, Nora Wunderlich, a friend of Baker's, went to the Greenville Police Department and turned over a ripped-up, handwritten confession note that Baker had given her. The note read:

> 10 days back I sacrificed my only male friend to Lucifer
>
> I shot him in the kitchen
>
> Bandana his [sic] all mixed in with powder from mice bait
>
> Ratchet straps
>
> Blanket
>
> Seran [sic] wrap 5 days bloody
>
> I had him wraped [sic] for 5 days
>
> In wrap = soaked.

State's Exhibit 50 and 178; Trial Tr. p. 179.

{¶ 7} After receiving the confession note, police officers searched Baker's residence and observed items that were consistent with the note. For example, the officers found a red ratchet strap and multiple buckets of Selontra mice bait. The officers also found a prescription pill bottle with Fleming's name on it, Fleming's cell phone, two cameras, a flashlight, two charging cords, a CD cover, and other various items belonging to Fleming. The officers also discovered multiple firearms on Baker's property.

{¶ 8} In addition, the officers searched Baker's Cadillac Escalade and noticed that it appeared to have been recently cleaned. Specifically, the officers smelled a strong odor of cleaning agent and observed brush and line marks on the carpet in the back cargo

area of the vehicle. Fletcher's neighbor, Stump, approached one of the officers at Baker's residence and indicated that Fletcher was Baker's girlfriend and that Fletcher had recently borrowed his Bissell ProHeat carpet cleaner.

{¶ 9} Baker's Escalade was towed to a special police lot for further analysis by an expert crime scene investigator from the Ohio Bureau of Criminal Investigation ("BCI"). Using Bluestar chemicals, the BCI investigator located bloodstains on the carpet in the vehicle's back cargo area. Carpet samples with the bloodstains were cut from the vehicle and sent to BCI's laboratory for testing.

*Search at Baker's Grandmother's Residence*

{¶ 10} On August 19, 2022, officers went to the residence of Baker's grandmother to continue their investigation. While searching the residence, the officers found two plastic totes sitting on the side of the residence's garage. When the plastic totes were opened, the horrendous smell of bodily decomposition filled the air. In one tote, the officers found a maggot-ridden trash bag containing several items that were stained and covered in bodily decomposition. The items in the trash bag included a bunch of clear plastic wrap, an orange ratchet strap, a yellow ratchet strap, brown wrapping tape, pieces of cardboard, a black rubber glove, a cigarette butt, a white mattress cover, and small pieces of a Styrofoam egg carton. In the second tote, which was covered by a black trash bag, officers found some more clear plastic wrap that was stained with bodily decomposition. They also found a red rubber link from chain-link belt, a piece of white hard plastic, a piece of metal, rat poison, and a stained white blanket.

{¶ 11} Inside a metal shed on the property, officers also discovered a large, white bucket that smelled of bodily decomposition when opened. The bucket contained a black trash bag that contained more plastic wrap covered in bodily decomposition, a red biohazard bag, an empty bag of Sakrete (a product that is used to make cement), a Mountain Dew can, a plastic gallon water jug, a stained white rope, a stained white towel, a black button-down Calvin Klein shirt, a bandana, and an Indian head ring that was known to belong to Fleming. The black rubber glove and cigarette butt that were found in one of the totes were sent to BCI's laboratory for testing.

*Search at Cal-Maine*

{¶ 12} After finding the disturbing items at Baker's grandmother's residence, officers conducted a search at Cal-Maine's Rossburg complex on August 20, 2022. During that search, officers observed a grassy area where the soil appeared to have been disturbed. The disturbed soil was near the white and gray storage barns where Baker worked. After inserting a probe into the soil, the officers could tell that the soil was loose and had been turned over. The officers also noticed that the hole in the ground from the probe smelled like decomposition. Given those observations, the officers began digging and eventually discovered Fleming's body.

{¶ 13} When Fleming's body was discovered, the officers observed that Fleming's foot had been contorted backward in an unnatural position. In addition, the officers observed that Sakrete had been poured over Fleming's head and that cement had begun to form around Fleming's face and mouth. After removing Fleming's body from the

ground, an eagle-shaped ring that belonged to Fleming was found underneath his body. An open pocketknife and a black rubber glove similar to the one found at Baker's grandmother's residence were also found at the burial site.

{¶ 14} Inside the gray storage barn, officers discovered a stained, flakey area on the floor that looked as if someone had spread wet concrete on the floor. The stains on the floor were red and appeared to be consistent with dried bodily residue. In addition, officers found red stains on tires that were stacked in the barn. A partial shoeprint was also found on one of the tires. In addition, officers found red stains on the slats of a wooden pallet. A large roll of plastic wrap that matched the plastic wrap recovered from Baker's grandmother's residence was also found in the barn. Officers further found two cigarette butts that were located next to the area where the floor had been stained. The tire with the shoeprint, the two cigarette butts, and the stained wooden pallet were sent to BCI's laboratory for testing.

{¶ 15} Inside the white storage barn, officers found several items that corresponded with the evidence found at Baker's grandmother's residence. For example, the officers found the same type of white towels, rope, and plastic wrap that had been found in the plastic totes. The officers also found a red rubber-link chain that matched the red rubber link found in one of the plastic totes. Several white buckets that matched the white bucket found in the metal shed were also discovered. In addition, the officers found a box of black rubber gloves that was for the same type of black rubber gloves that were found at the burial site and in one of the plastic totes.

{¶ 16} On the floor of the white barn, officers observed several tire marks, a wet

stain with dust gathered over it, and several piles of debris that had been swept up. Tucked behind a door, officers found two Kobalt shovels with residue on them that had drained onto the floor. On a small gravel pathway next to the white barn, officers found another one of Fleming's rings and some pieces of skin and a toenail.

*Cal-Maine Surveillance Videos*

{¶ 17} The general manager of Cal-Maine's Rossburg location provided the Darke County Sheriff's Office with access to the property's surveillance system. After officers reviewed the surveillance videos, they took video clips and stills of relevant events that occurred between August 8 and 12, 2022. The video clips and stills were admitted into evidence as State Exhibit No. 17. The State maintained that the video clips and stills showed Baker brining Fleming's body to Cal-Maine in his Escalade, transporting the body into Cal-Maine's gray barn, and then moving the body into the white storage barn.

{¶ 18} Video clips from August 8, 2022, showed that, at 7:53 a.m., Baker's Escalade arrived at Cal-Maine and parked near two small outbuildings. At 11:06 a.m., a white pickup truck driven by Baker backed up next to Baker's Escalade. At 11:12 a.m., the back hatch of Baker's Escalade was opened. At 11:26 a.m., the white pickup truck drove toward and backed into the gray storage barn with the truck's bed open and full of large items. At 11:53 a.m., Baker emerged from the white storage barn with his shirt off and a new shirt in hand and walked toward the white pickup truck. Between 3:23 p.m. and 3:28 p.m., Baker sprayed down and cleaning the white pickup truck. The pickup truck's bed was completely empty while Baker was cleaning it.

{¶ 19} Video clips from August 9, 2022, showed two individuals entering the gray storage barn at 3:16 a.m. One of the individuals held a large item and took the large item into the barn. At 5:25 a.m., the two individuals left the gray barn and walked away from the area.

{¶ 20} Video clips from August 11, 2022, showed Baker using a forklift to move a large item from the gray storage barn into the white storage barn at 11:30 a.m. Video clips from August 12, 2022, showed a white rag being placed over the security camera at 4:07 a.m. The rag obstructed the camera's view, but a different camera view showed some movement in the area of the white barn, as the door on the white barn was opened and closed multiple times. The rag was removed from the camera at 5:57 a.m. Later that morning, at 7:07 a.m., Baker swept the area outside the white storage barn.

*Home Security Camera Videos from Fletcher's Neighbor*

{¶ 21} Fletcher's across-the-street neighbors allowed officers to access their home security camera that was directed toward Fletcher's residence on Warren Street. Several video clips from the security camera were admitted into evidence as State's Exhibit 40. The video clips were from August 7, 2022, to August 21, 2022. The following were some of the relevant events that were recorded.

{¶ 22} Video clips from the morning of August 8, 2022 (the morning after Baker shot Fleming), showed Baker's Ford Mustang parking next to Fletcher's residence at 6:27 a.m. Baker exited the vehicle, retrieved a bag from the passenger side of the vehicle, and then placed the bag on Fletcher's front porch. A minute later, Fletcher exited the

passenger side of Baker's Mustang. When Fletcher exited the Mustang, she was carrying a black bag. The video showed Fletcher carrying the black bag up to her residence and Baker departing in his vehicle at 6:30 a.m. After Baker left, Fletcher took a trash bag out to the neighborhood trash receptacle at 6:36 a.m. and then sat on her front porch. At 6:41 a.m., Baker's Mustang returned to Fletcher's residence. Fletcher walked up to the passenger side of the Mustang for a few moments before the Mustang drove away.

{¶ 23} Video clips from August 9, 2022 (the morning that two individuals were recorded coming and going from Cal-Maine's gray barn), showed two people who walked up to Fletcher's residence at 12:34 a.m., hung out on the front porch, and then left the residence in Fletcher's vehicle at 12:50 a.m. Approximately five hours later, Fletcher's vehicle drove by her residence at 5:48 a.m. in the direction of Baker's house on Martin Street. Ten minutes later, Fletcher's vehicle returned and parked in front of her residence.

{¶ 24} Video clips from August 12, 2022 (the morning the rag was placed over the Cal-Maine security camera), showed movement behind Fletcher's residence at 1:58 a.m. A head lamp or cell phone could be seen illuminating the alleyway that led in the direction of Baker's residence.

{¶ 25} Video clips from August 14, 2022, showed Fletcher's neighbors taking their carpet cleaner over to Fletcher at 6:58 a.m. At 7:06 a.m., Fletcher took the carpet cleaner inside her residence. At 7:53 a.m., Fletcher loaded the carpet cleaner into her vehicle and drove away a few minutes later. At 10:05 a.m., Fletcher returned to her

residence with the carpet cleaner and then carried the carpet cleaner back over to her neighbors at 10:15 a.m. Fletcher wiped the carpet cleaner down with a towel as she returned it to her neighbors.

*Fletcher's Interview and the Search of Fletcher's Residence*

{¶ 26} After finding Fleming's body and the evidence linking Baker to Fleming's death, officers went to speak with Fletcher because they had reason to believe that she was Baker's girlfriend. On August 20, 2022, officers interviewed Fletcher on her front porch and made an audio recording of the interview. During the interview, Fletcher denied knowing anything about Fleming's whereabouts and professed her belief that Fleming was still alive. Fletcher told the officers that she did not know Fleming well and that she had last seen him a week prior while he was riding his bike.

{¶ 27} Fletcher also told the officers that on the morning of August 14, 2022, she had borrowed her neighbor's carpet cleaner for approximately one hour. Fletcher claimed that she had needed the carpet cleaner to clean SpaghettiOs that had spilled on her rug and couch. When the officers indicated that they had a video of her loading the carpet cleaner into her vehicle and taking it somewhere, Fletcher indicated that she might have taken the carpet cleaner to Baker's residence. Fletcher later told the officers that she had used the carpet cleaner to clean Baker's living room floor. Baker, however, did not have carpet in his living room; he had only an area rug that looked as if it had not been cleaned in some time and was half covered by furniture.

{¶ 28} After speaking with Fletcher, the officers searched Fletcher's residence

and discovered that half of Fletcher's closet was full of Baker's clothing. The closet contained Cal-Maine work shirts with Baker's name on them and other various men's items. The officers also noticed that it looked as if two people were sharing Fletcher's bedroom.

{¶ 29} In addition, the officers observed several plastic totes that were similar to the plastic totes found at Baker's grandmother's residence. The officers also observed a Selontra mice bait bucket that was exactly like the ones found at Baker's residence. A white rope that was similar to the stained white rope found in one of the plastic totes at Baker's grandmother's residence was also found by the officers. In Fletcher's kitchen, the officers found a ripped-up box of rubber gloves, the same type of black rubber gloves found at the burial site and at Baker's grandmother's house. The ripped-up box also matched the box of rubber gloves observed in the white storage barn at Cal-Maine.

{¶ 30} While searching a crawlspace at the exterior of Fletcher's residence, the officers found an Amazon box that contained Fleming's backpack. The backpack was black and contained several of Fleming's personal effects, including a hairbrush, deodorant, markers, a vape pen, tape, sunglasses, and court documents with Fleming's name on them. Hair from the hairbrush was sent to BCI's laboratory for testing.

*Forensic Testing and DNA Evidence*

{¶ 31} The forensic scientists at the BCI laboratory could not obtain a useable DNA standard from the swabs taken of Fleming's body. The scientists were, however, able to obtain a DNA profile from the hair on the hairbrush that was found in Fleming's

backpack. The scientists compared that DNA profile to a DNA standard that had been collected from Fleming's mother. The comparison established that Fleming's mother was the biological mother of the hair donor. In other words, the testing indicated that the DNA profile obtained from the hair on the hairbrush belonged to Fleming.

{¶ 32} Swabs taken from the stains on the carpet in Baker's Escalade, the stains on the floor of the gray storage barn, and the stained plastic wrap found at Baker's grandmother's residence all tested positive for blood. The DNA profile from all those stains and the stains on the wooden pallet in the gray barn matched the DNA profile obtained from the hair on the hairbrush found in Fleming's backpack, i.e., Fleming's DNA profile. A swab taken from the bristlehead of the carpet cleaner also tested positive for blood. However, the quality of the DNA found on the carpet cleaner was insufficient to make a DNA comparison.

{¶ 33} One of the two cigarette butts found in the gray storage barn had a mixed DNA profile that included Fletcher as the major DNA contributor. In other words, Fletcher's DNA was detected on one of the cigarette butts. The DNA profile obtained from the second cigarette butt was consistent with Baker's DNA. Also consistent with Baker's DNA was the DNA profile found on the black glove found at Fleming's burial site.

{¶ 34} A forensic scientist at BCI also analyzed the shoeprint on the tire from the gray storage barn. The scientist determined that the shoeprint matched the tread size and design of one of Fletcher's shoes. To make that determination, the scientist used question impressions, which are randomly acquired characteristics on the shoe's tread that accidentally occur when the shoe is worn. For example, a question impression

would include knicks or cuts in the tread or a rock or pebble getting stuck in between the tread, which would cause the tread to make a unique impression. In this case, the BCI scientist found three question impressions on the sidewall of the tire and was able to associate all three question impressions to Fletcher's shoe.

*Fletcher's Flight from Ohio*

{¶ 35} On August 22, 2022, the Greenville Police Department was advised that Fletcher's vehicle had been stopped for a speeding violation in Tennessee. It was reported that Baker was driving the vehicle and that Fletcher was riding as passenger. After learning this, the police issued arrest warrants for Fletcher and Baker, pinged their cell phones, and worked with U.S. Marshals to try to apprehend them. Fletcher and Baker were apprehended on August 24, 2022, in Ocala, Florida. During the arrest, officers noticed that Fletcher's vehicle was displaying stolen license plates.

{¶ 36} While Fletcher was in flight, several family members sent concerned text messages to Fletcher regarding her whereabouts and safety. Fletcher's father sent Fletcher a WhatsApp audio message asking her to come home and turn herself in. In response, Fletcher sent a response message saying: "I'm not going back. I don't want you to get in trouble. . . I don't want anyone else in trouble for this. I'm sorry. You don't know how bad this is killing me . . ." State's Ex. No. 603(B).

*The Verdict and Sentence*

{¶ 37} After considering the foregoing evidence, the jury found Fletcher guilty as

charged in the indictment. The trial court sentenced Fletcher to 24 months in prison for tampering with evidence and 12 months for gross abuse of a corpse. The trial court ordered those sentences to be served concurrently for a total term of 24 months in prison. The trial court also ordered the 24-month prison term to be served consecutively to the prison term imposed in Case No. 22CR00306.

{¶ 38} Fletcher now appeals from her judgment of conviction in Case No. 22CR00244, raising three assignments of error for review. For purposes of clarity, we will address the assignments of error out of order.

**Second Assignment of Error**

{¶ 39} Under her second assignment of error, Fletcher contends that her convictions for gross abuse of a corpse and tampering with evidence were not supported by sufficient evidence. We disagree.

*Standard of Review*

{¶ 40} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*,

79 Ohio St.3d 421, 430 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

*Gross Abuse of a Corpse*

{¶ 41} Fletcher was convicted of gross abuse of a corpse in violation of R.C. 2927.01(B), which provides that "no person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." R.C. 2927.01(B). "[E]vidence of an attempt to conceal a body is sufficient to sustain a conviction for gross abuse of a corpse." *State v. Whitaker*, 2022-Ohio-2840, ¶ 80, citing *State v. Bridges*, 2014-Ohio-4570, ¶ 63-64 (8th Dist.) (victim's body dumped into a pond after being tied to a metal pipe and a cinder block) and *State v. Nobles*, 106 Ohio App.3d 246, 267 (2d Dist.1995) (victim's body kept in a closet for several days before being placed in a dumpster).

{¶ 42} In this case, there is no dispute that Baker murdered Fleming. There is also no dispute that Fleming's body was buried at Cal-Main's Rossburg location in an area near the gray and white storage barns where Baker primarily worked. The State's evidence established that when officers discovered Fleming's body, it was contorted with Sakrete/cement poured over the head region. The State's evidence also established that Fleming's body had initially been wrapped in plastic wrap, which was eventually removed before the body was buried. Baker's confession note indicated that Fleming's body had been wrapped for five days.

{¶ 43} In addition, the State presented evidence indicating that at least two people had been involved in burying Fleming's body. Not only were two shovels found dripping with residue in Cal-Maine's white storage barn, but video clips taken from Cal-Maine's surveillance system showed two individuals entering Cal-Maine's gray storage barn at 3:16 a.m. on August 9, 2022, and leaving at 5:25 a.m. The gray barn shown on the video clip was the same gray barn in which officers found bloodstains that matched Fleming's DNA profile. It was also the barn in which officers found a roll of the same type of plastic wrap that was found covered in decomposition at Baker's grandmother's residence.

{¶ 44} Although officers could not positively identify the two individuals shown on the August 9th video clip due to darkness, the State presented other evidence indicating that the individuals were Fletcher and Baker. First, the home security camera video taken from the residence of Fletcher's neighbor showed two individuals leaving Fletcher's residence in Fletcher's vehicle at 12:50 a.m. on August 9, i.e., the same morning two individuals were recorded coming and going from the gray barn at Cal-Maine. Approximately five hours later, the neighbor's security camera recorded Fletcher's vehicle driving in the direction of Baker's residence at 5:48 a.m. and then returning to Fletcher's residence at 5:58 a.m. Fletcher's drive-by and return times were significant because the video clip from Cal-Maine showed the two individuals leaving the gray barn at 5:25 a.m. The timing of Fletcher's departure and return to her residence on the morning of August 9 suggested that Fletcher was one of the two individuals shown in the Cal-Maine video clip.

{¶ 45} In addition to the video evidence, the State presented evidence of a tire with

a shoeprint on it that matched the tread of one of Fletcher's shoes. The tire in question had been in the same gray barn where the two individuals were recorded coming and going during the early morning hours of August 9. The State also presented evidence establishing that Fletcher's and Baker's DNA were on the two cigarette butts found inside the gray barn. The shoeprint on the tire and the DNA evidence from the cigarette butt established that Fletcher had been inside Cal-Maine's gray barn at some point in time. This was significant because Fletcher, who was not an employee of Cal-Maine, had had no reason to be on Cal-Maine's property. Therefore, the evidence of Fletcher's presence in the gray barn further supported the notion that Fletcher was one of the individuals shown coming and going from the gray barn in the Cal-Maine video clip from August 9. That notion was further supported by a text message that Baker sent to Fletcher at 9:19 p.m. on August 9, which stated: "It's Dean. It's a rest night. Thought of you. Don't reply." Trial Tr. Vol. III, p. 518, State's Ex. 603(E)(9). A reasonable fact finder could have concluded from this message that Baker was indicating to Fletcher that they were going to take rest from being up all hours of the night at Cal-Maine.

{¶ 46} The movement shown behind Fletcher's residence at 1:58 a.m. on the August 12, 2022 home security video clip suggested that Fletcher was out and about from her residence during the time the rag was placed over Cal-Maine's security camera and during the time the door to the white barn was being opened and closed. Accordingly, that video evidence also suggested that Fletcher was at Cal-Maine with Baker on August 12.

{¶ 47} In addition to video evidence placing Fletcher at Cal-Maine, the State

presented evidence connecting Fletcher to the burial of Fleming's body. Specifically, the ripped-up rubber glove box found in Fletcher's kitchen was for the same type of black rubber gloves that were found at the burial site and Baker's grandmother's residence. The ripped-up box also matched the box of rubber gloves that was found in Cal-Maine's white barn. Also, the white rope found at Fletcher's residence was the same type of white rope that was found stained with bodily decomposition at Baker's grandmother's residence, and investigators found Fleming's backpack hidden in Fletcher's exterior crawlspace.

{¶ 48} As a further matter, the State presented evidence establishing that, after investigators discovered Fleming's body and searched Fletcher's residence, Fletcher and Baker fled to Florida in Fletcher's vehicle. The State also presented evidence establishing that Fletcher made incriminating comments in response to her Father's WhatsApp message. The fact that Fletcher fled with Baker, the timing of her flight, and her incriminating comments suggested a consciousness of guilt.

{¶ 49} When viewed in a light most favorable to the State, the evidence establishing Fletcher's presence in the gray barn with Baker at Cal-Maine, the evidence connecting Fletcher to the burial of Fleming's body, and the evidence showing Fletcher's consciousness of guilt would have, *at the very least*, permitted a rational factfinder to conclude beyond a reasonable doubt that Fletcher was complicit in the gross abuse of a corpse offense. That is, there was sufficient evidence to establish that Fletcher at least supported or assisted Baker with concealing Fleming's body at Cal-Maine, and thus was just as culpable as Baker in that regard. Moreover, a reasonable factfinder could have

concluded beyond a reasonable doubt that Baker and Fletcher's treatment of Fleming's body, i.e., wrapping it in plastic wrap for five days and pouring cement over the head before burying it in a contorted position, was sufficient to outrage reasonable community sensibilities. Accordingly, Fletcher's claim that her conviction for gross abuse of a corpse was not supported by sufficient evidence lacks merit.

*Tampering with Evidence*

**{¶ 50}** Fletcher was also convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides that: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall . . . [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" R.C. 2921.12(A)(1). "There are three elements of this offense: (1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 2014-Ohio-2139, ¶ 11.

**{¶ 51}** "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "[K]nowledge of a likely investigation may be inferred when the defendant commits a crime that is likely to be reported." *State v. Martin*, 2017-Ohio-7556, ¶ 118. Knowledge may be inferred in homicide cases because "[h]omicides are highly likely to be discovered and investigated."

*Id.*

{¶ 52} With regard to knowledge, the evidence discussed under the foregoing sufficiency analysis for gross abuse of a corpse indicated that Fletcher assisted Baker with concealing Fleming's body. Because Fletcher assisted in concealing Fleming's body, a rational factfinder could infer that Fletcher knew that Fleming would likely be reported missing and that an official investigation into Fleming's whereabouts would likely be instituted.

{¶ 53} With regard to altering, destroying, concealing, or removing evidence, the State's evidence established that, while having knowledge of the likely investigation into Fleming's whereabouts, Fletcher concealed Fleming's backpack and its contents in a crawlspace at her residence. Indeed, one of the home security video clips from August 8, 2022, showed Fletcher carrying a black bag into her residence from Baker's vehicle. The size of the black back shown on the video clip was consistent with Fleming's black backpack.

{¶ 54} The State's evidence also established that Fletcher borrowed her neighbor's Bissell ProHeat carpet cleaner to remove bloodstains from Baker's Escalade. The Cal-Maine video clips from August 8, 2022, indicated that Baker used his Escalade to transport Fleming's body to Cal-Maine. The forensic evidence established that there were bloodstains matching Fleming's DNA profile (from the hairbrush) on the carpet of the back cargo area of the Escalade. The forensic evidence also established that the borrowed carpet cleaner's bristlehead tested positive for blood even though Fletcher's neighbor testified that the carpet cleaner was relatively new, had only been used three

times, and had never been used to clean up blood.

{¶ 55} Moreover, the home security camera video clips from August 14, 2022, showed Fletcher loading the carpet cleaner into her vehicle, driving off with it, and then returning it to her neighbor approximately three hours later. Fletcher's movement of the carpet cleaner to another location supported the State's theory that she used it to clean Baker's Escalade, as did the fact that Fletcher lied to the police when she said that she had borrowed the carpet cleaner to clean Baker's living room floor. As previously discussed, the investigating officers observed that Baker's living room floor was not carpeted, but only had an area rug that was dirty and mostly covered by furniture. In contrast, the officers observed that Baker's Escalade had been recently cleaned, as they observed brush marks and lines on the vehicle's carpet and smelled the strong odor of cleaning agent.

{¶ 56} The timing of Fletcher's request to borrow the carpet cleaner, Fletcher's act of transporting the carpet cleaner to another location, Fletcher's lying to the police about why she borrowed the carpet cleaner, the clean condition/brush marks on the carpet of Baker's Escalade, and the blood found on the Escalade's carpet and on the carpet cleaner strongly suggested that Fletcher had used the carpet cleaner in an attempt to remove Fleming's bloodstains from the Escalade. Viewing all this evidence in a light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that Fletcher knew or should have known that an investigation was forthcoming with regard to Fleming, yet purposely took steps to cover up Fleming's murder by procuring a carpet cleaner to remove Fleming's bloodstains from Baker's Escalade.

Accordingly, Fletcher's claim that her conviction for tampering with evidence was not supported by sufficient evidence lacks merit.

{¶ 57} Fleming's second assignment of error is overruled.

## First Assignment of Error

{¶ 58} Under her first assignment of error, Fletcher claims that she was denied the right to a fair trial because the trial court permitted the State to present irrelevant evidence from Baker's murder case at her trial and that evidence was inflammatory and prejudicial. We disagree.

{¶ 59} "The admission or exclusion of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *State v. Malloy*, 2011-Ohio-30, ¶ 64, (2d Dist.) citing *State v. Sage*, 31 Ohio St.3d 173 (1987). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34. "An abuse of discretion includes a situation in which the trial court did not engage in a ' "sound reasoning process." ' " *Id.*, quoting *State v. Morris*, 2012-Ohio-2407, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id.*, citing *Morris* at ¶ 14.

{¶ 60} Except as otherwise provided by law, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." Evid.R. 402. " 'Relevant

evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "[I]t is the trial court's province to determine whether, under the circumstances, testimony is 'essentially misleading or too remote' to be deemed relevant . . . Trial courts have 'broad discretion' in determining relevance[.]" *State v. Yarbrough*, 2002-Ohio-2126, ¶ 35, quoting *Whiteman v. State*, 119 Ohio St. 285, 298 (1928) and *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967); *accord Thomas v. Bur. of Workers' Comp.*, 2016-Ohio-7246, ¶ 105 (2d Dist.).

{¶ 61} "Evidence concerning other facts which form part of the immediate background of the alleged act which forms the foundation of the crime charged is admissible." *State v. Curry*, 1997 WL 600056, *5 (4th Dist. Sept. 30, 1997), citing *State v. Wilkinson*, 64 Ohio St.2d 308 (1980), paragraph two of the syllabus. Therefore, "the prosecution is entitled to elicit information concerning the context of the investigation and arrest of a criminal defendant." *State v. Channels*, 1994 WL 730149, *4 (2d Dist. Dec. 30, 1994), citing *United States v. Williams*, 971 F.2d 157, 158 (8th Cir. 1992). Indeed, " '[t]he jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void without knowledge of the time, place and circumstances of the acts which form the basis of the charge.' " *Wilkinson* at 317, quoting *United States v. Roberts,* 548 F.2d 665, 667 (6th Cir. 1977).

{¶ 62} That said, under Evid.R. 403(A), even relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. "In reaching a decision involving admissibility under

Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect." *State v. Wright*, 2019-Ohio-4460, ¶ 50 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239 (1984), paragraph seven of the syllabus. For relevant evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great. *State v. Morales*, 32 Ohio St.3d 252, 258 (1987). "Furthermore, relevant evidence that is challenged as having probative value that is substantially outweighed by its prejudicial effects 'should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect' to the party opposing its admission." *Wright* at ¶ 50, quoting *Maurer* at 265.

{¶ 63} In this case, there is no dispute that Fletcher's charges for gross abuse of a corpse and tampering with evidence arose from Baker's act of murdering Fleming. Therefore, the evidence from Baker's murder case was extremely intertwined with Fletcher's charges. In order to give context to relevant actions by Fletcher and to the incriminating evidence found at Fletcher's residence, the State had to present a large amount of evidence from Baker's murder case. For example, the State had to present evidence showing what officers found at Baker's grandmother's house and at Cal-Maine, as that evidence included items that placed Fletcher in the gray barn at Cal-Maine and connected Fletcher to the burial of Fleming's body. The State also had to present evidence from Baker's murder case to give context as to why Fletcher borrowed the carpet cleaner, which supported her tampering with evidence charge. For example, the State had to present the Cal-Maine video clips showing Baker using his Escalade to

transport Fleming's body to Cal-Maine, the forensic evidence of the blood in the Escalade, and the officers' testimony regarding the Escalade's clean appearance. These are just a few of the many examples of how the evidence from Baker's murder case provided the jury with necessary contextual information to fully assess the evidence against Fletcher.

{¶ 64} Fletcher, however, takes issue with the large number of exhibits admitted at trial. She also takes issue with alleged repetitive testimony related to the Cal-Maine surveillance videos and the condition of Fleming's body at the burial site. Given the complexity of the case, we do not think that the number of exhibits or the amount of testimony presented on the aforementioned topics was inappropriate or unduly prejudicial. The record indicates that the State significantly paired down its evidence and did its best to present only relevant information that helped explain the circumstances underlying Fletcher's charges. For example, the State did not present any evidence on how or why Baker murdered Fleming. The State also did not present any testimony or photographic evidence pertaining to Fleming's autopsy. The record also indicates that the State only presented three of six expert witnesses from Baker's murder trial.

{¶ 65} Fletcher also takes issue with Baker's confession note being admitted into evidence. Fletcher argues that the confession note was irrelevant and unduly prejudicial. We disagree. The confession note was relevant in that it indicated Fleming had been wrapped in plastic for five days. That information not only helped with establishing a timeline but went directly to Baker and Fletcher's treatment of Fleming's body, which was an element of gross abuse of a corpse.

{¶ 66} With regard to the note's prejudicial effect, we find that the note was no

more prejudicial than the other relevant evidence establishing how Fletcher and Baker treated Fleming's body, i.e., the photographs of cement on Fleming's head and the plastic wrap stained with bodily decomposition. Although it is arguable that the confession note reflected poorly on Fletcher because she was in a relationship with Baker, we find that the note's probative value was not outweighed by any such prejudicial effect.

{¶ 67} Moreover, the record indicates that the trial court was "very mindful" of the prejudicial effect of the murder case evidence and that it ordered the parties to "keep [the evidence] streamlined to this case, the defendant in this case, and the charges heard in this case." Trial Tr. Vol. II, p. 211-212. Upon review, we find that is exactly what the State did, and the trial court did not abuse its discretion when it permitted the State to present a large amount of evidence from Baker's murder case.

{¶ 68} Fletcher's first assignment of error is overruled.


**Third Assignment of Error**

{¶ 69} Under her third assignment of error, Fletcher claims that her trial counsel provided ineffective assistance because counsel failed to request a jury instruction on aiding and abetting. We disagree.

{¶ 70} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which has been adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136 (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, Fletcher must show that her trial counsel rendered deficient performance and that

counsel's deficient performance prejudiced her. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

**{¶ 71}** To establish deficient performance, Fletcher must show that her trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland*.

**{¶ 72}** To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

**{¶ 73}** When reviewing ineffective assistance claims, we will not second-guess trial strategy decisions. *State v. Mason*, 82 Ohio St.3d 144, 157 (1998); *Strickland.* at 689. It is well established that " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2011-Ohio-4475, ¶ 15 (2d Dist.), quoting *State v. Olsen*, 2011-Ohio-3420, ¶ 121 (2d Dist.). Therefore, "[d]ebatable strategic and tactical

decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992).

**{¶ 74}** "[A]s a general rule, the decision of whether or not to request a particular jury instruction is a matter of trial strategy and, for that reason, will not substantiate a claim of ineffective assistance of counsel." (Citation omitted.) *State v. Ferrell*, 2020-Ohio-6879, ¶ 49 (10th Dist.); *accord State v. Conway*, 2006-Ohio-2815, ¶ 111 ("counsel's decision not to request a jury instruction falls within the ambit of trial strategy"); *State v. Morris*, 2005-Ohio-1136, ¶ 100 (9th Dist.) ("[a]n attorney's decision not to request a particular jury instruction is a matter of trial strategy and does not establish ineffective assistance of counsel"); *State v. Pennington*, 2011-Ohio-4445, ¶ 28 (2d Dist.) ("the request of [jury] instructions are matters of trial strategy").

**{¶ 75}** In this case, the trial court's jury instructions included an instruction on complicity that stated, in relevant part: "No person acting with the kind of culpability required for the commission of an offense shall *aid or abet* another in committing the offense," and whoever does so "is guilty of complicity in the commission of an offense, and shall be prosecuted or punished as if he or she was a principal offender." (Emphasis added.) Trial Tr. Vol. IV, p. 776. Fletcher takes issue with the fact that her trial counsel did not request an instruction on what it meant to "aid or abet." However, it is clear from the record that Fletcher's trial counsel did not want the complicity instruction to be given to the jury and objected to it at trial. *Id.* 729-730. Given counsel's stance on the complicity instruction, it logically follows that counsel would not have wanted the jury to

be provided with the following jury instruction on aiding and abetting that Fletcher claims her counsel should have requested:

> AIDED OR ABETTED. Before you can find the defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in the commission of the offense and that the defendant shared the criminal intent of the principal offender. Such intent may be inferred from the circumstances surrounding the offense including but not limited to presence, companionship, and conduct before and after the offense was committed. The mere presence of the defendant at the scene of the offense is not sufficient to prove, in and of itself, that the defendant was an aider and abettor.

Ohio Jury Instructions, 2 CR § 523.03(A) (Rev. Feb. 6, 2016).

**{¶ 76}** Upon review, we find that Fletcher's trial counsel may have believed that the foregoing aiding and abetting instruction would have highlighted the complicity instruction that counsel did not want included in the first place. Also, Fletcher's trial counsel may have thought that the aiding and abetting instruction was unfavorable to Fletcher because there was a plethora of evidence indicating that Fletcher had assisted Baker by hiding Fleming's backpack, obtaining a carpet cleaner to remove bloodstains from his Escalade, and helping him to wrap and bury Fleming's body at Cal-Maine. Trial counsel's decision in that regard was a matter of trial strategy. Because counsel's decision not to request an aiding and abetting instruction was a matter of trial strategy, it

cannot form the basis of an ineffective assistance claim. Fletcher's ineffective assistance claim fails for that reason.

**{¶ 77}** Fletcher's third assignment of error is overruled.

II.    CASE NO. 22CR00306 – ENDANGERING CHILDREN AND INVOLUNTARY MANSLAUGHTER

**Facts and Course of Proceedings**

**{¶ 78}** On December 27, 2022, a Darke County grand jury returned an indictment charging Fletcher with one count of endangering children in violation of R.C. 2919.22(A), a felony of the third degree, and one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree. The charges stemmed from allegations that on or about June 5 or 6, 2022, Fletcher ignored signs of serious illness in her 14-year-old, diabetic son, Caleb, and failed to provide him with medical care, which ultimately resulted in Caleb's death. Fletcher pled not guilty to the indicted charges and the matter proceeded to a jury trial. The State presented several witnesses at trial, including various medical professionals who had treated Caleb and assisted Fletcher with managing Caleb's diabetes. The following information was elicited at trial.

**{¶ 79}** Caleb had been diagnosed with Type 1 diabetes in January 2016, when he was eight years old. When Caleb was first taken to the hospital for his condition, he was

in Diabetic Ketoacidosis ("DKA"). DKA is a serious, life-threatening condition that occurs when the body does not have enough insulin to process blood sugar for many hours. DKA is marked by the body's pH level dropping and the body's becoming acidic. When the body becomes acidic, it produces carbon dioxide, which the body tries to expel through breathing. This results in the person gasping for air. It can also cause nausea and vomiting. DKA symptoms look similar to and are often mistaken for a gastrointestinal virus. The only way DKA can be treated is by getting insulin into the body via an insulin drip into the vein, which restores a balanced pH level in the body.

{¶ 80} Caleb's doctor testified that managing a child's diabetes is not a simple process, and that a Type 1 diabetes diagnosis causes a tremendous change to the life of the diagnosed child and the child's family. As a result of Caleb's Type 1 diabetes diagnosis, Fletcher and Caleb's father, Justin, received training and information from Dayton Children's Hospital on how to treat and care for a child with Type 1 diabetes. Fletcher and Justin met with a diabetes educator who showed them how to check blood sugars, ketones, and how to determine insulin doses. The diabetes educator also trained them on what to do when Caleb had high or low blood sugars and when to call the physician if Caleb showed signs of illness. Fletcher passed a test on how to care for a child with Type 1 diabetes, while Justin struggled with passing the test. Dayton Children's Hospital provided Caleb and his family with a team of social workers, doctors, nurses, and dieticians to assist with Caleb's condition.

{¶ 81} Caleb's father, Justin, testified that Fletcher was smarter than him and that he depended on her to make sure he had all the information he needed to care for Caleb.

He testified that Fletcher kept him stocked with diabetic supplies and that she always made sure he had an EpiPen and that his EpiPens were not expired. He testified that Fletcher provided "tubs" for Caleb's "little finger pokers." Trial Tr. Vol. II, p. 283. Justin testified that Fletcher got a new Dexacom glucose monitor for Caleb when his original one was lost or broken, and that Fletcher "went through hell" to get it. *Id.* at 287. According to Justin, Fletcher "always made sure we had everything we needed." *Id.* at 283. Justin also testified that if Caleb got sick while in his care, he would take him home to Fletcher because she knew what to do.

{¶ 82} In 2016, Caleb attended all his office visits with the doctor and his blood sugar levels were within the normal range. Caleb was brought to his appointments primarily by Fletcher. In February 2017, Fletcher reported to Caleb's doctor that his blood sugar levels had been going up and down. The doctor testified that Fletcher was appropriately concerned about Caleb's high blood sugar levels and that there was no indication they were missing injections.

{¶ 83} In June 2017, Caleb's blood sugar levels went down, indicating that they were doing a good job. However, in September 2017, Caleb's blood sugar went up to 9.2 percent, which the doctor testified was cause for concern. In response, the doctor advised Caleb to continuously wear his Dexacom sensor or to check his blood sugar levels more consistently. In doing so, the doctor again went over with Fletcher how important it was to supervise and watch Caleb's blood sugar levels. The doctor did not see Caleb again until June 2018. The doctor testified "that's a long time to go without diabetes care and we recommend coming back every three months." Trial Tr. Vol. IV, p.

640. Based on Caleb's blood sugar levels, the doctor believed that the supervision of his insulin shots could be better.

{¶ 84} In November 2018, Caleb visited the emergency room in DKA for the first time since he was initially diagnosed. In July 2020, Caleb was once again admitted to the hospital in DKA. To be in DKA, Caleb had to have missed a significant amount of insulin shots.

{¶ 85} Caleb continued to miss appointments with his doctor during the COVID pandemic. A medical social worker with Dayton Children's Hospital talked with Fletcher about the missed appointments and about how to manage diabetes with a child entering the teenage years. According to the social worker, Fletcher was receptive to her advice and to talking with her. The social worker testified that Fletcher said she did not realize how many appointments they had missed. Fletcher advised the social worker that transportation was a barrier to attending appointments. In response, the social worker offered to get Fletcher gas cards, to work with her insurance company to provide transportation, or to rent Fletcher a cab.

{¶ 86} On February 14, 2022, Caleb was admitted to the hospital with DKA again. At that time, Caleb had nausea and vomiting, and his blood sugar levels were out of control. On March 2, 2022, Caleb had to be picked up from school because his blood sugar levels were too high. Later in March 2022, Caleb was hospitalized for another issue and expressed that he wanted to kill himself. During that time, Fletcher was provided with more education on the importance of taking control of Caleb's diabetes treatment.

{¶ 87} As he became a teenager, Caleb began doing insulin shots by himself. Caleb's doctor, however, wanted Fletcher to administer the injections or to watch Caleb do it. Thirty days prior to his death, Caleb admitted to his doctor that he was missing insulin shots pretty frequently. The doctor testified that in all her time with Caleb and his family, she did not get the impression that Fletcher did not care about Caleb. Although the doctor testified that she "was concerned about supervision," she found that Fletcher "always appeared to care about Caleb." Trial Tr. Vol. p. 693.

{¶ 88} Between March 1, 2022, and May 4, 2022, Caleb did not attend school on a regular basis due to his high blood sugar levels. On May 5, 2022, Caleb went to the school nurse and reported that he had been sick and vomiting for a week and a half and wanted to go to the hospital. The school called Fletcher and informed her that Caleb was very ill and wanted to go to the hospital. Fletcher told the school that she would call the doctor and that Caleb should go to the home of his step-grandmother, who lived across the street from the school. Caleb's medical records do not indicate whether Fletcher sought any medical treatment for Caleb that day. That was the last day Caleb attended school.

{¶ 89} On June 5, 2022, Caleb was at Justin's house. Before Justin left for work as a truckdriver, he realized that Caleb was ill and vomiting. Justin's fiancée stayed with Caleb while Justin was working. Justin's fiancée called Justin and told him that Caleb had not stopped vomiting and that he wanted to go to the hospital. In response, Justin contacted Fletcher and told her how ill Caleb was. Justin told Fletcher that Caleb was vomiting water, passing out in the trashcan, and telling his fiancée that he wanted to go

to the hospital. Fletcher, who was also at work, eventually spoke to Justin's fiancée and told her to give Caleb a nausea pill, which the fiancée did. Justin testified that Fletcher had resolved similar issues with a nausea pill in the past. Fletcher told Justin that Caleb had "a stomach bug," Trial Tr. Vol. II, p. 323. She later told Justin to bring Caleb to the IGA where she was working.

{¶ 90} When Justin got home to take Caleb to Fletcher, he found Caleb lying on the couch. Justin asked Caleb how he was feeling and Caleb said, "not very good, but I'll be all right." *Id.* at 330. Caleb got up to leave, but his legs were weak, so Justin carried him to the car. Caleb told Justin that he was thirsty but did not feel like he could eat anything. Thereafter, Justin got Caleb some water and took him to the IGA where Fletcher worked. When Justin placed Caleb in Fletcher's car, Caleb, who was disoriented, mistakenly called Justin "Pap" instead of "Daddy." *Id.* Justin made Fletcher promise to take Caleb to the hospital if he got any worse. According to Justin, Fletcher replied: "I got this, I don't need you to tell me what to do. Calm the F down. You worry too much." *Id.* at 333.

{¶ 91} Fletcher told authorities and the medical social worker at Dayton Children's Hospital that Caleb began to feel better when she took him home and that Caleb had been talking and acting normal. Specifically, Fletcher told the medical social worker that Caleb was sick when Justin dropped him off, but that Caleb "was laughing and joking with her and that was something that led her to think that he wasn't as sick." *Id.* at 217.

{¶ 92} Fletcher told Justin that "by the time they got home, [Caleb] was fine" and that she and Caleb "sat up all night and talked, and everything was cool." *Id.* at 354.

However, on a different occasion, Fletcher told Justin that Caleb "was puking so much . . . the smell inside the house was so bad that she couldn't stand it" and that she had "to go outside just to eat." *Id.* at 354-355.

{¶ 93} Fletcher's neighbor observed that Caleb appeared very sick and could not walk on his own when Fletcher arrived home with him. Fletcher told the neighbor that Caleb's blood sugars were high, that he did not need to go to the hospital, and that Caleb did not want to go to the hospital. Fletcher advised officers that she gave Caleb four or five shots of insulin the night he came home. The last shot Fletcher referenced was one given at 1 a.m. Fletcher admitted that she did not check Caleb's ketones. Fletcher also told officers that Caleb sat up and got a drink at 2 a.m. and got up to use the bathroom between 3 a.m. and 4 a.m. Fletcher claimed that she was up with Caleb until 4 a.m. and then went to bed and slept for approximately 10 hours. Caleb did not have any dinner that night and did not have any breakfast, lunch, or insulin the following morning.

{¶ 94} When Fletcher woke up a little after 1 p.m. the following afternoon, she found Caleb lying unresponsive on the couch. Caleb was blue and cold to the touch. At 1:21 p.m., Fletcher texted her neighbor, who had a diabetic son, for help. Fletcher then went to the neighbor's door and asked for help again, as the neighbor had been sleeping. When the neighbor responded and saw Caleb's condition, he told Fletcher to call 9-1-1 and began doing sternum rubs on Caleb until the paramedics arrived.

{¶ 95} When the paramedics arrived, they found Caleb unresponsive with no pulse and in DKA. Caleb's blood sugar level was recorded at over 600. A level of 400 is considered high and warrants medical assistance. The paramedics employed life-

saving measures on Caleb and transported him to the hospital. Caleb arrived at the hospital in cardiac arrest, shock, and severe dehydration. Caleb's condition was so severe that he had to be placed on life support. His blood sugars were at 11 percent, which indicated that his blood sugars had not been well controlled for at least three months.

{¶ 96} On June 7, 2022, Caleb was taken off life support and died from DKA as a result of his Type 1 diabetes. When Caleb was taken off life support, the medical social worker who had worked with Fletcher observed Fletcher "actively grieving" and described the moment as being "horrific for [Fletcher.]" *Id.* at 239.

{¶ 97} After considering the evidence presented at trial, the trial court provided the jury with instructions that did not address the level of culpability/mens rea that was required to find Fletcher guilty of the endangering children charge. Following deliberations, the jury found Fletcher guilty of both endangering children and involuntary manslaughter. Thereafter, the trial court sentenced Fletcher to 36 months in prison for endangering children and an indefinite term of 8 years to 12 years in prison for involuntary manslaughter. The trial court ordered those sentences to be served concurrently for a total, indefinite sentence of 8-to-12-years in prison.

{¶ 98} Fletcher appeals from her judgment of conviction in Case No. 22CR00344, raising two assignments of error for review. The numerical designation of the two assignments of error is a continuation of the three assignments of error that were addressed in Case No. 22CR00244. Accordingly, the two assignments of error pertaining to this case will be designated as Fletcher's fourth and fifth assignments of

error.

## Fourth Assignment of Error

{¶ 99} In her fourth assignment of error, Fletcher argues that the trial court erred by failing to instruct the jury on the element of recklessness for the charge of endangering children in violation of R.C. 2919.22(A). "Normally, courts review a trial court's decisions regarding jury instructions for an abuse of discretion." (Citation omitted.) *State v. Wallace-Lee*, 2020-Ohio-3681, ¶ 20 (2d Dist.). However, because Fletcher failed to object to the jury instructions at trial, she has waived all but plain error for appeal. *Id.*; *State v. Midkiff*, 2022-Ohio-4004, ¶ 11 (2d Dist.) "Plain error is demonstrated when a 'manifest miscarriage of justice' results from an improper jury instruction." *Wallace-Lee* at ¶ 20, citing *State v. Recker*, 2007-Ohio-216, ¶ 11 (3d Dist.).

{¶ 100} "As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged, and, where specific intent or culpability is an essential element of the offense, a trial court's failure to instruct on that mental element constitutes error." (Footnotes omitted.) *State v. Adams*, 62 Ohio St.2d 151, 153 (1980); a*ccord State v. Wamsley*, 2008-Ohio-1195, ¶ 17. That said, "a trial court's failure to separately and specifically charge the jury on every element of each crime with which a defendant is charged does not per se constitute *plain error* nor does it necessarily require reversal of a conviction." (Emphasis added; footnote omitted.) *Adams* at 154; *accord Wamsley* at ¶ 17. "Only by reviewing the record in each case can the probable impact of such a failure be determined, and a decision

reached as to whether substantial prejudice may have been visited on the defendant, thereby resulting in a manifest miscarriage of justice." *Adams* at 154. Therefore "an appellate court must review the [jury] instructions as a whole and the entire record to determine whether a manifest miscarriage of justice has occurred as a result of the error in the instructions." *Wamsley* at ¶ 17, citing *Adams* at paragraph three of the syllabus.

{¶ 101} Because R.C. 2919.22(A) neither specifies the required degree of culpability nor plainly indicates that the General Assembly intended to impose strict liability, the Supreme Court of Ohio has held that the existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A). *State v. McGee*, 79 Ohio St.3d 193, 195 (1997). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶ 102} In *Adams*, the Supreme Court of Ohio reviewed a case in which the trial court had failed to instruct the jury on the essential element of recklessness in its child endangering instruction. Under the specific circumstances of that case, the Supreme Court concluded that the faulty jury instruction did not rise to the level of plain error. *Id.* at 155. The Supreme Court reached that conclusion because it found the defense had presented no evidence at trial supporting a theory that the injuries to the child in question

were caused by mere criminal negligence as opposed to recklessness. *Id.* at 155. Rather, the sole defense at trial was that the appellee had not been the person who had abused the child. *Id.* As a result, the Supreme Court determined that "the existence of recklessness on the part of the abuser was never put in issue at trial." *Id.* Indeed, the Supreme Court found that "the state's proof of the brutal nature of the boy's injuries support the conclusion that the person inflicting even some of the injuries would necessarily have known that his or her actions would risk causing serious physical harm to the 2 ½ year old child." *Id.* Accordingly, the Supreme Court in *Adams* concluded that there was no manifest injustice in the faulty jury instructions because no jury could have found that the crime was the result of mere negligence, rather than recklessness. *Id.* Therefore, the *Adams* Court concluded that the error was not reversible, plain error.

{¶ 103} Similarly, in *State v. Tolliver*, 1996 WL 715438 (2d Dist. Dec. 13, 1996), a jury found the defendant guilty of kidnapping but had never been instructed "that an essential element of the charged offense was that [the defendant's] purpose in removing [the victim] from the place where he was found or restraining him of his liberty was for the purpose of terrorizing him or inflicting serious physical harm upon him." *Id.* at *2. That error was not preserved for appeal; therefore, this court undertook a plain error analysis to determine whether the error had resulted in a manifest injustice.

{¶ 104} After undertaking a plain error analysis, this court determined that the faulty jury instruction did not result in a manifest injustice because the attention of the jury was focused on a different issue. *Id.* at *2-3. Specifically, this court found that "the real point of dispute between the parties was whether Tolliver was a knowing participant in

the brutal attack upon [the victim]." *Id.* at *2. The defense argued that Tolliver "had no foreknowledge that the teenagers were going to tie [the victim] to a chair and beat him" while "the teenagers, on the other hand, testified that [Tolliver] had planned and instigated the assault." *Id.* Accordingly, "[t]he question for the jury was whom to believe." *Id.* Because the attention of the jury was never focused on whether Tolliver had the requisite purpose in instigating and planning the assault, this court found that it was unlikely that the jury's verdict turned upon the trial court's faulty jury instructions and thus found no reversible, plain error. *Id.* at *3.

{¶ 105} In *State v. Tolliver*, 2013-Ohio-115 (2d Dist.) ("*Tolliver II*") — a case that is unrelated to the previously discussed case (the appellants just happen to have the same last name) — the defendant was convicted of robbery under R.C. 2911.02(A)(3) and argued that the mens rea applicable to the use-or-threatened-use-of-force element of that offense was recklessness. *Id.* at ¶ 16 and ¶ 26. This court agreed with that assertion and went on to review whether the trial court's failure to instruct the jury on the element of recklessness warranted a reversal of the defendant's conviction. *Id.* at ¶ 26. Because the jury instructions were not objected to a trial, this court undertook a plain error analysis. *Id.* at ¶ 26-34. In conducting a plain error analysis, we found that whether the defendant had recklessly used force or recklessly threatened the immediate use of force was an element that "was very much in dispute between the parties" and that "the failure to submit that essential element to the jury worked a manifest injustice upon [the defendant], because it deprived him of his right to have a jury decide that issue beyond a reasonable doubt." *Id.* at ¶ 33.

{¶ 106} Although the Supreme Court of Ohio later reversed this court's decision in *Tolliver II* on grounds that the recklessness mens rea did not apply to robbery under R.C. 2911.02(A)(3), *Tolliver II* nevertheless suggests that, when an element is in dispute, a manifest injustice occurs when that element is not included in the jury instructions. Other courts of this state have reached the same conclusion. *See, e.g., State v. Buzanowksi*, 2014-Ohio-1947, ¶ 17-18 (8th Dist.) (finding that the trial court's failure to instruct the jury on the culpable mental state that applies to the offense of contributing to the unruliness or delinquency of a child resulted in a manifest miscarriage of justice because "[u]nlike *Adams*, the mental state of Buzanowski, and specifically, his knowledge of the victim's age prior to offering her alcohol, was heavily disputed in the first trial"); *State v. Singh*, 2001 WL 322714, *3 (12th Dist. Apr. 2, 2001) (finding that the trial court's failure to instruct the jury on the "knowingly" element of criminal damaging amounted to plain error because the jury could have reasonably concluded from the evidence that the defendant did not act knowingly, and "[h]ad the jurors been properly told that the prosecution had to prove beyond a reasonable doubt that appellant had acted 'knowingly,' the verdict might have been different"); *State v. Grigg*, 2011-Ohio-1511, ¶ 16 (9th Dist.) (finding that the trial court's omission of an essential element of burglary in the jury instructions, i.e., that the structure the defendant trespassed in was "a permanent or temporary habitation," amounted to plain error because it was unclear from the evidence whether anyone resided in the portion of the structure where the burglary took place); *State v. Bethel*, 2014-Ohio-3861, ¶ 13 (4th Dist.) (finding that the trial court's failure to submit the "deadly weapon or dangerous ordnance" element of felonious assault to the jury caused a

manifest injustice and constituted plain error because "whether Bethel used a deadly weapon was very much in dispute between the parties").

{¶ 107} In this case, we find that the central issue in dispute at trial was whether Fletcher *recklessly* violated her duty of care to Caleb on June 5 through 6, 2022. For the jury to find that Fletcher acted recklessly, the evidence had to establish that Fletcher acted with heedless indifference to the consequences and that she disregarded a substantial and unjustifiable risk that her conduct was likely to cause a certain result, i.e., Caleb's death. *See* R.C. 2901.22(C). The record contained some evidence indicating that Caleb's condition had been improving on the night in question. There was also some evidence indicating that Fletcher had believed, based on her past experience caring for Caleb, that the illness he was experiencing was a stomach bug that could be treated with a nausea pill. Given that evidence, the issue of whether Flecther was reckless was in dispute. Because the issue of recklessness was in dispute, and because recklessness is an essential element of the endangering children charge, the trial court's failure to instruct the jury on the essential element of recklessness resulted in a manifest injustice. Therefore, we find that the trial court committed plain error in that regard, which warrants reversing Fletcher's conviction for endangering children.

{¶ 108} Fletcher's fourth assignment of error is sustained.

## Fifth Assignment of Error

{¶ 109} In her fifth assignment of error, Fletcher contends that her convictions for

endangering children and involuntary manslaughter were not supported by sufficient evidence and were against the manifest weight of the evidence. However, we need not address Fletcher's sufficiency and manifest weight claims because we have already determined that Fletcher's conviction for endangering children must be reversed due to the jury instruction error. Our finding in that regard affects Fletcher's involuntary manslaughter conviction, because endangering children was an underlying predicate felony offense to involuntary manslaughter. Indeed, one commits involuntary manslaughter when he or she "cause[es] the death of another . . . *as a proximate result of . . . committing or attempting to commit a felony.*" (Emphasis added.) R.C. 2903.04(A). Because Fletcher's endangering children offense was the predicate felony in this case, her conviction for involuntary manslaughter must also be reversed as a result of the jury instruction error that we discussed under Fletcher's fourth assignment of error.

{¶ 110} Fletcher's fifth assignment of error is overruled as moot.


III.    CONCLUSION

{¶ 111} Fletcher's judgment of conviction in Case No. 22CR00244 is affirmed. However, the case shall be remanded to the trial court for the sole purpose of amending Fletcher's judgment entry of conviction nunc pro tunc to reflect that Fletcher was convicted of gross abuse of a corpse as opposed to abuse of a corpse. As discussed under footnote one of this opinion, there is no dispute that Fletcher was charged and convicted of violating R.C. 2927.01(B), which is a fifth-degree-felony offense that is designated as "gross abuse of a corpse." R.C. 2927.01(C). In contrast, the offense

designated as "abuse of a corpse" is a second-degree-misdemeanor offense in violation of R.C. 2927.01(A).   *Id.*

{¶ 112} Fletcher's judgment of conviction in Case No. 22CR00306 is reversed. That case shall be remanded to the trial court for the purpose of holding a new trial at which the trial court correctly instructs the jury on the element of recklessness that is required to commit the offense of endangering children.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.