**[Cite as *State v. Fletcher*, 2026-Ohio-1072.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-10 |
| Appellee | : | |
| | : | Trial Court Case No. 22CR00306 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| ASHLEY FLETCHER | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on March 27, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and HUFFMAN, J., concur.

JOHNNA M. SHIA, Attorney for Appellant
DEBORAH S. QUIGLEY, Attorney for Appellee

LEWIS, J.

{¶ 1} Ashlee Fletcher[1] appeals from her conviction for involuntary manslaughter following a jury trial in the Darke County Common Pleas Court. For the following reasons, we affirm the judgment of the trial court.

## I. Facts and Course of Proceedings

{¶ 2} This appeal involves the death of C.N., the 14-year-old son of Fletcher and Justin Noll. C.N. was diagnosed with Type 1 diabetes when he was 8 years old. The State's case against Fletcher turned on her criminally reckless failure to manage C.N.'s diabetes, so the record in this matter regarding this serious disease is extensive. Type 1 diabetes is a lifelong disease caused by the autoimmune destruction of insulin-producing cells in the pancreas. Insulin is a hormone that the body needs to metabolize glucose (blood sugar). The destruction of insulin-producing cells leads to a loss of insulin production and abnormal glucose regulation, often leading to high glucose levels in the blood. Unable to use blood glucose for energy, the body attempts to compensate by breaking down muscle and fat, leading to the buildup of ketones in the blood, which can become toxic. This can result in diabetic ketoacidosis ("DKA"), which can be life-threatening.

{¶ 3} Living with Type 1 diabetes requires lifelong treatment with insulin. People with Type 1 diabetes need to give themselves multiple injections of insulin per day or use an

_____

[1] The record establishes that the correct spelling of appellant's first name is Ashlee. The trial court used "Ashley" in the final judgment entry, which is what we use to create our case captions.

insulin pump that is attached to the body. They must also check their blood sugar levels frequently and closely manage their diet and exercise. Without enough insulin, uncontrolled high blood sugars can, over time, lead to serious complications including death. Conversely, too much insulin can cause low blood sugar, which can lead to loss of consciousness or even death.

{¶ 4} An A1C test measures the average amount of glucose in a person's blood over the previous three months. The result is reported as a percentage. The higher the percentage, the higher a person's blood glucose levels have been on average. An A1C test can give the patient and physician a glimpse into how well the patient's diabetes management plan has been working over the previous three months and help them determine if any part of the treatment plan should be adjusted.

{¶ 5} C.N. died on June 7, 2022. Six months later, a Darke County grand jury indicted Fletcher on one count of endangering children, a third-degree felony in violation of R.C. 2919.22(A), and one count of involuntary manslaughter, a first-degree felony in violation of R.C. 2903.04(A). The case proceeded to trial.

{¶ 6} The State presented several witnesses at trial, including various medical professionals who had treated C.N. and assisted Fletcher with managing C.N.'s diabetes. After considering the evidence presented at trial, the trial court provided the jury with instructions that did not address the mens rea that was required to find Fletcher guilty of the endangering children charge. Following deliberations, the jury found Fletcher guilty of both endangering children and involuntary manslaughter. The trial court sentenced Fletcher to 36 months in prison for endangering children and an indefinite term of 8 to 12 years in prison for involuntary manslaughter. The trial court ordered those sentences to be served

3

concurrently for a total, indefinite prison sentence of 8 to 12 years. Fletcher timely appealed from the trial court's judgment.

{¶ 7} On appeal, we reversed the conviction for endangering children because the trial court committed plain error by failing to instruct the jury on the essential element of recklessness. *State v. Fletcher*, 2024-Ohio-5117, ¶ 107 (2d Dist.). We also reversed the conviction for involuntary manslaughter because Fletcher's endangering children offense was the predicate felony for the involuntary manslaughter conviction. *Id.* at ¶ 109. We remanded the case to the trial court for the purpose of holding a new trial.

{¶ 8} A second jury trial was held in April 2025 on the endangering children and involuntary manslaughter charges. Fourteen witnesses testified. Linda Duvall, a registered nurse and nurse practitioner at Dayton Children's Hospital, testified about the education provided to C.N. and his parents to help them manage C.N.'s diabetes upon his diagnosis. Dayton Children's Hospital typically provides two days of diabetes education to the parents or caregivers when a child is first admitted to the hospital and diagnosed with Type 1 diabetes. The education includes how to measure blood sugar levels, how to test for ketones, how to administer insulin, and what to do when the child is sick. It was stressed to Fletcher, as the primary caretaker, that C.N. should be taken to the hospital when he showed signs of illness and repetitive vomiting. Duvall had concerns with both parents because neither performed well on a written test covering the diabetes education that they had just received.

{¶ 9} Kathleen Caldwell, a medical social worker at Dayton Children's Hospital, provided services to caregivers who struggled with bearing the costs of diabetes management or who needed additional resources to assist them in effectively managing diabetes. She explained that consistently elevated A1C numbers or multiple admissions

4

for DKA were signs of medical neglect. Caldwell recalled that both parents struggled with a written test, which covered the initial education they received while at Dayton Children's Hospital. Ideally, C.N.'s parents would have stayed for a third day of education, but they did not do so due to work constraints. Caldwell noted that C.N.'s parents seemed motivated by other stressors in their lives, and she worried about whether they fully grasped the seriousness of managing their son's diabetes. While the parents showed love for C.N., Caldwell wanted to see more understanding from the parents about the seriousness of managing diabetes.

{¶ 10} After C.N. suffered multiple DKAs, Fletcher received additional diabetes education. Caldwell noted that several appointments were canceled by Fletcher due to issues arising from her divorce and lack of transportation. A referral was made to Children's Services after a February 2022 DKA.

{¶ 11} After C.N. died, Fletcher "shared a concern that [Justin] would never forgive her for this." Tr. 272. Caldwell testified about the contrasting stories she received from C.N.'s parents about what happened:

> [Justin] was describing somewhat heartbreakingly how [C.N.] was critically ill, he had large ketones. He was begging to go to the hospital, which is hard for me, but that mom - - and that he was then becoming progressively less responsive, wasn't able to ambulate on his own.
>
> [Fletcher] described that [C.N.] had been able to walk into the house; that he was alert. At one point she was stating that he was kind of joking around with her, that - - she was describing him as being much more alert than dad had described.

5

Tr. 275. Caldwell noted that Fletcher was devastated by C.N.'s death and was "very tearful, fearful that [Justin] would blame her." Tr. 314. Justin showed text messages to Caldwell to illustrate that he wanted to take C.N. to the hospital, but Fletcher had told him that he would get in trouble if he did that and might be criminally charged. Justin told Caldwell that "his belief at the time was that only [Fletcher] was the one who was allowed to seek medical care." Tr. 315.

{¶ 12} Justin testified next for the State. Fletcher and Justin were in a relationship when C.N. was born in December 2007, but they separated when C.N. was almost four years old. They had an understanding that Fletcher was the legal custodian and Justin was permitted to have visitation with C.N. every Wednesday and every other weekend. C.N. was eight years old when he got sick while at Justin's home. C.N. was taken to the hospital where he was diagnosed with Type 1 diabetes. Justin relied on Fletcher for the necessary supplies to help manage C.N.'s diabetes. If Justin became scared that he could not handle a situation involving C.N. and his diabetes, Justin would end his visitation early and return C.N. to Fletcher.

{¶ 13} On April 30, 2022, Justin called the police because he had to go to Fletcher's house, pick up C.N., and feed him after Fletcher lied to Justin by telling him that she was at home with C.N. A few weeks later, Justin discovered that C.N. had not been regularly attending school.

{¶ 14} Justin had visitation with C.N. the weekend of June 4, 2022. C.N. seemed fine when Justin picked him up, and they went to Trader's World and a few other places. Early Sunday morning (June 5), around 2:00 or 3:00 a.m., C.N. said he was not feeling well. Justin, who was a truck driver at that time, had to go to Michigan for work. He left his girlfriend, Courtney, in charge of C.N. According to Justin, Courtney knew as much about

6

diabetes management as he did. A few hours later, Justin began texting Fletcher about C.N.'s condition based on information that Courtney provided. C.N. was vomiting up water. Justin told Fletcher that he wanted to send C.N. to the hospital. Fletcher discouraged this and told Justin to have Courtney bring C.N. to the I.G.A. where Fletcher was working. Justin explained that he had been dealing with C.N.'s illness since 8:30 p.m. the night before. Justin grew worried, left work, and drove home from Michigan. He arrived home around 3:00 p.m. on Sunday. Justin drove C.N. over to Fletcher's work and helped load him into Fletcher's car. When Justin placed C.N. in Fletcher's car, C.N., who was disoriented, mistakenly called Justin "Pap" instead of "Daddy." Justin made Fletcher promise to take C.N. to the hospital if he got any worse. Fletcher told Justin that she would handle the situation. According to Justin, he did not take C.N. to the hospital because Fletcher did not give him permission.

{¶ 15} Justin tried calling Fletcher later that night but there was no answer. He drove to Michigan for work early the next morning (June 6, 2022). Fletcher called him in the afternoon and told him that C.N. was unresponsive. He began yelling at Fletcher over the phone. Justin testified that Fletcher ultimately gave him two different stories about what had happened. Her first story was that everything was fine until C.N. suddenly became unresponsive in the early afternoon of June 6. The other story was that C.N. was very sick and kept vomiting and she could not stand the smell in the house, so she went outside and ate dinner. Justin stated that he hoped that Fletcher had loved C.N., "but I - - I doubt it." Tr. 418.

{¶ 16} Brian Walker, a lieutenant in the Greenville Fire Department, testified that he was dispatched to C.N.'s diabetic emergency on June 6, 2022. When Walker arrived at Fletcher's home, he observed that C.N. was pale and unresponsive, he had no pulse, and

7

his core was cold. The two women on scene said they had just spoken with C.N., but Walker believed his condition was not consistent with someone who had just spoken to anyone. One of the women, presumably Fletcher, was yelling on her phone outside while the medics were working on C.N. C.P.R. was administered at the scene and on the way to the hospital.

{¶ 17} Dr. Michael Vish, the chief medical safety officer at Dayton Children's Hospital, was the physician who took care of C.N. when he arrived in the pediatric critical care unit on June 6, 2022. He explained that C.N.'s condition was very bleak when he arrived, as evidenced by C.N.'s prolonged period of C.P.R., his uncontrolled diabetes, the extraordinarily high level of acid built up in the blood, and his completely flat brain activity. Dr. Vish worked for hours trying to keep C.N.'s blood pressure up while slowly bringing his blood sugar level down. He talked to Justin in person and spoke with Fletcher over the phone about C.N.'s condition. Dr. Vish opined that if C.N. had been taken to the hospital 12-15 hours earlier than he was, there was a substantial chance that he would not have needed C.P.R.

{¶ 18} Lauren Burneka, a registered nurse at Dayton Children's Hospital, conducts diabetes education. She spends two days training parents after a diabetes diagnosis. During Burneka's training sessions, she stresses the importance of monitoring blood sugar levels every two or three hours when a child is sick, and she tells families to call the office or hospital when a diabetic child begins vomiting. Fletcher had been reeducated in the past regarding what to do when C.N. was sick, and Burneka gave Fletcher printed instructions as to what to do in that situation. Burneka noted that C.N. was not seen during a one-year period, which is a long time to go between appointments at Dayton Children's Hospital. She

8

also explained that diabetes management is more difficult during the teenage years because the teenager wants to be the one to completely manage his diabetes.

{¶ 19} Shannon Hellman was a social worker at Dayton Children's Hospital during the time C.N. was treated there. The first time she had contact with C.N. and his parents was in February 2022 when C.N. came to the hospital suffering from a DKA. It was clear that C.N. was receiving an insufficient amount of insulin. She recognized that the family was struggling at that time with C.N. and Fletcher moving out of the home of C.N.'s stepfather, Fletcher working full-time, and C.N. in counseling. A Children's Services case was opened because of C.N.'s February 2022 hospital visit.

{¶ 20} David Stump testified next. He lived across the street from Fletcher. Occasionally, Fletcher came over to his house and spoke with his fiancé, Angela Bowman. Around 1:00 p.m. on June 6, 2022, Stump's son told Stump that Fletcher was screaming across the street. Stump went over to Fletcher's house and saw her crying on her phone while C.N. was lying flat on his back on the couch. C.N. was shaking and had a blank stare. Stump told Fletcher to call 9-1-1.

{¶ 21} Angela Bowman testified that she lived with David Stump. She knew of C.N. but had never met him. Bowman also has a son with Type 1 diabetes, and she told Fletcher to ask if she ever had any questions about managing diabetes. Bowman witnessed Fletcher helping C.N. into the house on Sunday night, June 5, 2022. She described it as similar to seeing someone help a drunk person up the steps. Fletcher told her later that night that C.N. was really sick and his blood sugar was really high. According to Bowman, "I asked [Fletcher] why she didn't take [C.N.] to the hospital, and she told me that because he didn't want to go." Tr. 540. Fletcher also told her that C.N. had been sick for a couple of days and that his father was not allowed to take him to the hospital.

9

{¶ 22} On the afternoon of June 6, 2022, Fletcher asked Bowman's son to get Bowman. When Bowman came over to Fletcher's home and saw C.N. on the couch, she noticed that C.N.'s arms were crossed, he was blue, his eyes were glazed over, and it did not look like he was breathing. While Bowman was looking at C.N., Fletcher was outside the house on the phone arguing with Justin.

{¶ 23} Mike Honeyman, a paramedic with Greenville Township Emergency Services, testified that he was dispatched to Fletcher's home at 1:27 p.m. on June 6, 2022. He discovered C.N. on the couch with a cyanotic blue color, no pulse, and no respirations. C.N. was moved to the hard floor so that C.P.R. and medications could be administered. While this occurred, a woman, presumably Fletcher, was on the porch yelling on her phone. The emergency personnel spent 22 minutes inside the house with C.N. before he was transported to the hospital.

{¶ 24} Cody Dirksen, an employee of the Greenville Fire Department, was dispatched to Fletcher's home on June 6, 2022, based on a report of an unresponsive teenager having a diabetic emergency. Once he entered the home, Dirksen realized C.N. was in cardiac arrest, so he returned to his emergency vehicle to obtain the machine for administering continuous C.P.R. Dirksen received conflicting information as to when C.N. last spoke. He was told that C.N. last spoke around 4:00 a.m. and that C.N. spoke shortly before Dirksen arrived at Fletcher's home later that afternoon. Dirksen was at the home for about 30 minutes before C.N. was transported to the hospital.

{¶ 25} Amanda Fischer, who was C.N.'s school nurse, testified that she typically checked C.N.'s sugar levels four times per day when he attended school. Fischer described Fletcher as pleasant and cooperative when they first met, but as the years went on, Fletcher was not always nice to Fischer. According to Fischer, C.N. did not manage his

diabetes well after February 2022. She testified, "It wasn't good. [C.N.] just didn't seem to get better after February. His sugars [were] just so uncontrolled. He wasn't at school a lot after that February." Tr. 580. Fischer noted that C.N. was a little deceptive about his diabetes management during his teenage years and that she had contacted Children's Services in November 2021 over her concerns that C.N.'s diabetes was not being managed well. The last time Fischer saw C.N. was on May 5, 2022. He was lethargic and said that he had been vomiting and had not eaten for two days. His ketones and sugar levels were high. Fischer called C.N.'s mother and advised her to take C.N. to the hospital. Fletcher asked Fischer to instead take C.N. across the street from the school to the home of C.N.'s step-grandmother.

{¶ 26} Morissa Reed, who was a detective with the Greenville Police Department at the time C.N. died, testified that she interviewed Justin and Fletcher after C.N.'s death. Reed eventually obtained text messages from Fletcher's cell phone. Fletcher provided Reed with C.N.'s blood sugar monitor, which allowed Dayton Children's Hospital to download information regarding his blood sugar numbers in the weeks leading up to his death. Justin explained to Reed that Fletcher made it very clear C.N. would be taken away from him if he took C.N. to the hospital. Reed also testified that Fletcher stated, "this is my fault." Tr. 657.

{¶ 27} Dr. Yelena Nicholson, a pediatric endocrinologist at Dayton Children's Hospital, testified last at the trial. She was one of seven doctors at Dayton Children's Hospital who treated diabetic patients. The goal was to see the diabetic patients every three months until the patients turned 22 years old. At Dayton Children's Hospital, caregivers are not allowed to take a diabetic child home until they receive some education on managing diabetes. C.N. was one of Dr. Nicholson's patients. Dr. Nicholson testified

11

about the medical visits C.N. had at Dayton Children's Hospital from his first hospital visit in 2017 until his death in June 2022. She noted that Fletcher was doing a good job managing C.N.'s diabetes in the early years. Dr. Nicholson explained, however, that even though it was stressed to Fletcher how important it was for C.N. to come to Dayton Children's Hospital every three months, there were several times when Fletcher cancelled appointments.

{¶ 28} As time went on, there were signs that C.N.'s parents were not adequately managing C.N.'s diabetes. Dr. Nicholson was concerned that C.N. was not getting enough of his day insulin and missing his night insulin. It was stressed to Fletcher that C.N. could not manage his own insulin. In June 2021, C.N. was rushed to the hospital after suffering his third DKA. C.N. had passed out while with Justin. C.N. remained in the hospital for three days and had relatively severe pancreatitis. C.N. suffered a fourth DKA on February 14, 2022. His parents failed to call the diabetic team at the hospital when C.N. was sick. C.N. went through four or five days of nausea and vomiting before he was finally brought into the hospital.

{¶ 29} C.N. was seen at Dayton Children's Hospital on March 23, 2022. At that time, C.N. was quite depressed but was not deemed suicidal. He was referred to mental health counseling. Dr. Nicholson again stressed to Fletcher that she had to manage C.N.'s diabetes.

{¶ 30} Dr. Nicholson reviewed C.N.'s blood sugar readings for the thirty days prior to his death, which were retrieved from his Dexcom monitoring device. She noted that insulin was given sporadically over that period. Dr. Nicholson explained, "I think that's [C.N.], you know, doing it and not doing it. But there is obviously no supervision because nobody is looking that those blood sugars are high." Tr. 757. She noted that the alarms for high blood sugar levels on the Dexcom monitoring device had been turned off. Dr. Nicholson

12

testified that C.N. was very dehydrated and needed insulin administered through an IV to correct the metabolic changes that were occurring on the weekend of June 5, 2022. She believed it was unlikely that C.N. was sitting up and talking and joking after he had been disoriented and stumbling earlier. The parents should have called the diabetic team at Dayton Children's Hospital when C.N. was not feeling well and was not eating or drinking. Dr. Nicholson opined that C.N. probably should have been transported to the hospital 48 hours before he was transported there on June 6, 2022. She also stated that Justin should have brought C.N. to the hospital when Justin returned from Michigan on June 5, 2022, rather than giving him to Fletcher. Similarly, Nicholson testified that Fletcher should have taken C.N. to the hospital or called for an ambulance when she received C.N. from Justin.

{¶ 31} The jury returned guilty verdicts on both counts in the indictment. On April 18, 2025, the trial court issued its sentencing entry. The court merged the two counts and proceeded with sentencing on the involuntary manslaughter count. The trial court sentenced Fletcher to an indefinite term of imprisonment of a minimum of 8 years to a maximum of 12 years. Fletcher filed a timely notice of appeal.

## II.    Assignment of Error

{¶ 32} Fletcher's sole assignment of error states:

The State's evidence was insufficient as a matter of law and the manifest weight of the evidence does not support the jury's verdicts.

{¶ 33} Whether the evidence presented at trial is legally sufficient to sustain a conviction is a question of law that an appellate court reviews de novo. *State v. Groce*, 2020-Ohio-6671, ¶ 7, citing *In re J.V.*, 2012-Ohio-4961, ¶ 3. "To resolve a sufficiency challenge, we must determine 'whether, after viewing the evidence in a light most favorable

13

to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKelton*, 2016-Ohio-5735, ¶ 325, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court does not engage in a determination of the witnesses' credibility when reviewing the sufficiency of the evidence. *State v. Goff*, 82 Ohio St.3d 123, 139 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Nor does an appellate court assess whether the evidence admitted at trial should be believed but, rather, if believed, the evidence "would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. "We will not disturb the verdict unless we find that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001), citing *Jenks* at 273.

{¶ 34} In contrast to a sufficiency challenge, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *Black's Law Dictionary* (6th Ed. 1990). "A reviewing court considering a manifest-weight claim 'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.'" *State v. Group*, 2002-Ohio-7247, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 35} Fletcher was convicted of involuntary manslaughter in violation of R.C. 2903.04(A), which states: "No person shall cause the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." Flecher's involuntary manslaughter conviction under R.C. 2903.04(A) was based on her felony

14

violation of R.C. 2919.22(A), which provides, in pertinent part: "(A) No person, who is the parent . . . of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶ 36} "Because R.C. 2919.22(A) neither specifies the required degree of culpability nor plainly indicates that the General Assembly intended to impose strict liability, the Supreme Court of Ohio has held that the existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A)." *Fletcher*, 2024-Ohio-5117, at ¶ 101 (2d Dist.), citing *State v. McGee*, 79 Ohio St.3d 193, 195 (1997). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶ 37} Fletcher argues that she was not aware of the extent of C.N.'s sickness and Justin was in a better position to recognize when C.N. needed to go to the hospital. Therefore, according to Fletcher, the State did not prove that she was reckless, and the State failed to prove that Fletcher's failure to take C.N. to the hospital on the early evening of June 5 was the proximate cause of C.N.'s death. We disagree. The evidence presented at trial, when viewed in a light most favorable to the prosecution, is such that any rational trier of fact could have found the essential elements of involuntary manslaughter proven beyond a reasonable doubt. The record also establishes that Fletcher's conviction for involuntary manslaughter is not against the manifest weight of the evidence.

15

{¶ 38} The overwhelming evidence at trial established that Fletcher received repeated training to call Dayton Children's Hospital if C.N. was sick. Fletcher was well-aware of what could happen if C.N.'s diabetes was not managed properly. Prior to his death, C.N. suffered several DKAs due to poor management of his diabetes. The evidence further established that Fletcher dissuaded Justin from taking C.N. to the hospital on June 5, 2022, the day before he died, despite the fact that she was informed about how sick he was. Fletcher took custody of C.N. in the early evening of June 5 and subsequently told her neighbor's girlfriend that C.N. was really sick but that he did not want to go to the hospital. Fletcher's neighbor noted that Fletcher had to help C.N. up the stairs to get him into Fletcher's house. Justin testified that C.N. had wanted to go to the hospital on June 5, but Justin was scared to take him there because of Fletcher's admonitions that C.N. may be taken away. Justin also explained that he had to assist C.N. into Fletcher's car. Justin asked Fletcher to take C.N. to the hospital if he got any worse, and Fletcher assured him that she would take care of it. But Fletcher did not.

{¶ 39} The evidence also showed that Fletcher gave conflicting stories of what happened after she took custody of C.N. on June 5, 2022. Fletcher gave stories to different witnesses that C.N. was in good spirits, was joking around, and was talking a few minutes before he became unresponsive in the early afternoon of the day he died. Several witnesses testified that these stories were inconsistent with what they witnessed or with what a person would be like that was suffering the shock to the body that C.N. suffered. The jury also heard testimony that Fletcher stood outside her home talking on the phone with Justin while her son was unresponsive and undergoing C.P.R. inside the home and testimony that Fletcher believed C.N.'s death was her fault. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the

16

factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.). "This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Segovia*, 2024-Ohio-1392, ¶ 36 (2d Dist.), citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

**{¶ 40}** In sum, the overwhelming evidence showed that Fletcher, the primary caretaker of C.N. and a person charged with helping her teenage son manage his diabetes, created a substantial risk to the health or safety of C.N. by violating a duty of care, protection, or support. The diabetes education and training she had received and the existence of multiple DKAs prior to C.N.'s death established that Fletcher was well-aware of the risks of not ensuring that C.N.'s diabetes was properly managed and not seeking assistance or treatment from Dayton Children's Hospital when C.N. was sick. Despite the training she had received and her past experiences, which should have reinforced the need to call Dayton Children's Hospital sooner rather than later, Fletcher chose not only to forego medical treatment for C.N. when she regained custody of him in the early evening of June 5 but also discouraged Justin from seeking medical treatment for C.N. when he had custody of him in the morning and afternoon of June 5. The evidence also established that Fletcher's delay in seeking medical treatment after she drove away with C.N. on June 5 proximately caused C.N.'s death. As Dr. Vish explained, if C.N. had been taken to the hospital 12-15 hours earlier than he was, there was a substantial chance that he would not have needed C.P.R.

**{¶ 41}** As the witnesses consistently testified throughout the trial, C.N.'s death was as tragic as it was avoidable. Fletcher's involuntary manslaughter conviction was supported by sufficient evidence, and the jury did not lose its way in finding Fletcher guilty of involuntary manslaughter. The assignment of error is overruled.

### III. Conclusion

**{¶ 42}** Having overruled the assignment of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.