[Cite as *State v. Fabian*, 2026-Ohio-1788.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| STATE OF OHIO | : |
| | : C.A. No. 30546 |
| Appellee | : |
| | : Trial Court Case No. 2024 CR 02462 |
| v. | : |
| | : (Criminal Appeal from Common Pleas |
| MICHAEL FABIAN | : Court) |
| | : |
| Appellant | : **FINAL JUDGMENT ENTRY &** |
| | : **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on May 15, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, PRESIDING JUDGE

EPLEY, J., and HUFFMAN, J., concur.

DAVID R. MILES, Attorney for Appellant
ANDREW T. FRENCH, Attorney for Appellee

LEWIS, P.J.

**{¶ 1}** Defendant-appellant Michael Fabian appeals from his three arson convictions in the Montgomery County Common Pleas Court following a jury trial. For the following reasons, the judgment of the trial court is affirmed.

## I. Facts and Course of Proceedings

**{¶ 2}** On September 6, 2024, Fabian was indicted by a Montgomery County grand jury on one count of aggravated arson (agreement for hire) in violation of R.C. 2909.02(A)(3), a first-degree felony; four counts of aggravated arson (occupied structure) in violation of R.C. 2909.02(A)(2), second-degree felonies; and five counts of arson (harm to property of another having a value of $1,000 or more) in violation of R.C. 2909.03(A)(1), fourth-degree felonies. All charges related to a fire that occurred on June 10, 2024.

**{¶ 3}** Fabian filed a motion to suppress his statements made to fire investigator Katy Baughman on two separate occasions. Following a hearing, the trial court overruled the motion as to Fabian's statements made in the first interview but sustained the motion as to Fabian's statements made in the second interview. The case proceeded to a jury trial.

**{¶ 4}** Dennis Mills testified on behalf of the State. In June 2024, Mills was Fabian's friend and they saw each other every day. He had known Fabian for about a year. Mills was a convicted felony sex offender who also had a prior conviction for failure to verify his address. He had additional prior convictions for retaliation and theft. In June 2024, Mills

2

was on post-release control and was being monitored by a GPS tracker. Mills did not have a stable address and often stayed near East Third Street in Dayton.

{¶ 5} Fabian also did not have a stable address. As of June 2024, Fabian had lived in a vacant multi-unit property at 2105 and 2107 East Fourth Street ("2105 Property") for four or five months. According to Mills, Fabian stayed in the vacant home to keep people out of it and do some repair work on it. Fabian claimed he was getting paid to stay in the home. Mills had been to the home several times but did not do any work on the property. The inside was "pretty bad" and was getting remodeled. Although that property was vacant, there were other occupied homes on the street.

{¶ 6} On June 5, 2024, Mills was with Fabian inside the 2105 Property getting high on drugs. While they were there, someone pulled up in a truck and told them to get out. Mills stayed inside the property, but Fabian went outside and spoke to a man. When Fabian returned inside, he told Mills that "if something happens to the property" they would both be taken care of monetarily. Tr. 91. Fabian said that he should do it and collect the money. Mills suggested that Fabian make a firebomb using toilet paper. When Fabian asked Mills if he wanted to help Fabian get rid of the property, Mills told him he would have to think about it. Fabian planned to "take care of the property" by setting it on fire on Friday, June 7, 2024, and was going to finish taking out the wiring and copper before setting the house on fire. Because of his conversation with Fabian, Mills asked his parole officer to contact his former parole officer, fire investigator Baughman, whom Mills knew had become a fire marshal.

{¶ 7} No fire occurred on Friday, June 7, 2024. On Sunday, June 9, 2024, Fabian and Mills met up around 10 p.m. at the Family Dollar store located at 2601 East Third Street. Fabian told Mills he was going to burn the property that night. Fabian asked Mills to come

3

with him, but Mills declined and went to the area around Fifth Street and Webster where Mills stayed for the rest of the night.

**{¶ 8}** On Monday, June 10, 2024, Mills learned of a fire on East Fourth Street. He rode his bicycle past the 2105 Property and observed massive damage to three buildings, including the 2105 Property, which had burned down. He saw Fabian later that day at Living Word Church, which hosted lunch. It was Mills's birthday and they talked about what they were going to do later that night. When Mills asked Fabian why he burned the property, Fabian denied doing it and laughed.

**{¶ 9}** Prior to the June 10, 2024 fire, Fabian had stolen Mills's food stamp card and owed him money. As part of the investigation into the fire, Mills told Baughman that the theft had happened on "Wednesday," which he testified meant May 3, 2024. Mills told her that Fabian knew he was upset that Fabian had stolen his things. Mills had confronted Fabian and said that Fabian had to repay him and that it had cost him a date. Mills denied that the reason he reported the June 5, 2024 conversation he had with Fabian about setting the property on fire was because he was mad that Fabian had stolen his food stamps.

**{¶ 10}** Shawn Davis also testified. Davis was a convicted felony sex offender and had recently picked up a new felony charge for failure to register his address. As part of a plea agreement with the State, he agreed to testify against Fabian in exchange for an agreement that he would receive community control sanctions rather than a prison sentence.

**{¶ 11}** Davis testified that as of June 10, 2024, he was friends with Fabian and had known him for about a year. Davis had lived in Texas for a while and went by the nickname "Tex." Davis testified that he had lost his home but remained employed at Big Muffler on Keowee. Davis's brother lived on Third Street, and Davis lived in his brother's garage. Davis rode his bike to and from work each day and met Fabian while riding his bike. When

4

they met, Fabian was staying on the porch of a house on Third Street. The two became best friends and Davis would meet up with Fabian every day after work. They walked around, got cigarettes, and spent time together. Because Davis was employed, he would help Fabian and make sure they had food or whatever they needed.

{¶ 12} About a week or two prior to June 10, 2024, Davis was aware that Fabian had started staying at the 2105 Property. Davis had even stayed at the 2105 Property with Fabian for about a week in early June. Fabian told Davis that he was staying at the property because some guy wanted him to stay there. Davis did not do any work on the property. Fabian made statements about getting rid of the property and burning it down. According to Fabian, the owner was going bankrupt, and the owner wanted the property gone for insurance money. Davis claimed that a lot of people knew about Fabian's statement, but Davis thought Fabian was lying.

{¶ 13} Davis ran into Fabian in the early morning hours of June 10, 2024, at the Family Dollar. He had not seen Fabian for two or three days. Davis knew that something was wrong because Fabian was pushing a cart. Davis asked Fabian what was wrong and Fabian replied that he had been run off the property. They pushed Fabian's cart to the dollar store, and Davis stayed with Fabian's cart while Fabian went to find some cigarettes. Usually, they looked for cigarettes at the factory down the road. People left half-used cigarette butts in the ash tray, which Davis and Fabian collected. Louis (unknown last name) also met up with Davis at the Family Dollar while they waited for Fabian to return. Davis kept an eye on Fabian's cart and used one of Fabian's blankets while he waited for Fabian.

{¶ 14} On June 9, 2024, the Family Dollar surveillance video captured Fabian and his cart around 9:30 p.m. and again at 10:08 p.m. Fabian was recorded again at 12:25 a.m.

5

on June 10, 2024.   A little after 2:30 a.m., Fabian and his cart were seen on the surveillance video, when Davis met up with Fabian and agreed to watch the cart.   At 2:44 a.m., Louis and Davis moved Fabian's cart so that nobody would mess with it.   At 3:19 a.m. on June 10, 2024, Fabian returned to the Family Dollar.

{¶ 15} Davis saw Fabian return walking via Third Street.   Davis estimated that the walk from the Family Dollar to the 2105 Property took about seven minutes or less.   Davis did not recall if Fabian had any cigarettes when he returned, but stated he probably did because he never let them down and always collected them.   When Fabian returned, Davis noticed that Fabian was "different" and just wanted to lie down.   Fabian smelled like a campfire, and he had not smelled like that before he left.

{¶ 16} Fabian and Davis left the Family Dollar and went to a wooded area down the alley across from the store.   Fabian crawled under some brush and laid down to sleep. Davis then got his bike out of Fabian's cart and left.   He did not see Fabian again after that.

{¶ 17} Davis spoke with fire investigator Baughman on June 13 and 14, 2024.   He did not mention to Baughman that Fabian had smelled like a campfire, but he did think about it when he spoke to her.   Davis had not known that the 2105 Property had burned down until he talked to Baughman.

{¶ 18} Lyle Dalton testified that he met Fabian through a friend and had known him for almost four years.   Although Dalton had an apartment, a lot of his friends were homeless.   At one point, Dalton's girlfriend was homeless, and she moved into a garage with Fabian.   Dalton and Fabian became friends and saw each other two or three times a week.

{¶ 19} Around June 9, 2024, Dalton knew Fabian to stay in a vacant house on East Fourth Street, which was the 2105 Property.   The home at one time had been half burned,

6

and Fabian said he worked at the house. Fabian had been in the house for about three or four weeks and claimed he was collecting copper and whatever else was salvageable for the owner of the property. Dalton understood that whatever Fabian salvaged, he could cash in and that was considered his pay. At some point, Dalton was informed that the owner would "pay swell" if Fabian burned the place down and the owner could get insurance. Dalton rejected the idea, so Fabian did not ask Dalton to help him and did not mention it again.

{¶ 20} On June 9, 2024, Dalton and Fabian were at the 2105 Property collecting copper. They were also smoking marijuana, methamphetamine, and fentanyl. Smoking methamphetamine required the use of an open flame. Because the place was dry and they did not want to start a fire, they were careful smoking the drugs.

{¶ 21} Around 2:30 or 3:30 p.m., two men arrived in a pickup truck and told them to get off the property. They said that Fabian and Dalton did not belong there and that Fabian was not getting paid. Fabian became irate because he did not understand why he would not get paid. They were given 15 minutes to pack up their stuff and leave, which they did. The men took photographs of Fabian and Dalton while they were inside the 2105 Property, and at trial, Dalton identified himself and Fabian in the photographs. When Dalton and Fabian left, Dalton did not see Fabian throw down a cigarette. Fabian was known to collect partially used cigarettes from ashtrays and always had a bag full of half cigarettes. Dalton left the property and went home. He did not know where Fabian went but saw Fabian head down Fourth Street towards Findlay. Fabian had his cart, which contained all of his property.

{¶ 22} On the afternoon of June 10, 2024, Dalton was out walking, and he saw a big pile of rubble in place of the 2105 Property, as well as five houses around it that were all

7

melted. The fire was still smoldering, and firemen were putting out fires. Dalton returned to the property around 1:00 a.m. the next morning to collect copper because the fire had made it easy to access. He denied that he had started the fire to access the copper because the scrapyards do not take copper if the wire is burned off or charred. While Dalton was in the rubble, he saw headlights of a vehicle approaching, so he grabbed his things and got off the rubble pile. When the car pulled up to Dalton, Fabian was inside the car with his mom and two dogs. The first thing Fabian said to Dalton was, "I didn't start this fire, dude." Tr. 151.

{¶ 23} Ernie DuBose testified that he did carpentry work and landscaping and worked as a contractor at the 2105 Property. DuBose and his friend Dennis McCarthy worked on the property together. Prior to the June 10, 2024 fire, the property was in poor condition; it had been condemned and boarded up. The owner of the property had DuBose find a bunch of homeless guys to rip out the walls and tear the house down to the studs so that it could be rebuilt. By June 9, 2024, the house had been torn down to the studs and boarded up. The owner had obtained a permit to work on the property, but no one was actively working on the property on June 9, 2024.

{¶ 24} Around 2:00 or 3:00 p.m. on June 9, 2024, DuBose and his son went to the 2105 Property to mow the grass. DuBose had not been to the property for about two months. When they arrived, DuBose heard a noise inside the house. He went to the back of the house where it was boarded up, moved the wood aside, and saw two men inside the house. DuBose asked the men what they were doing and told them they could not be at the property. One of the men got very upset and claimed he was told he could be there. DuBose told the man that was not true. DuBose took photographs of the men, which were the same photographs that Dalton identified during his testimony as depicting himself and

8

Fabian.   After a few minutes, the men left.   DuBose did not see the men smoking anything when he was there.   He did not notice any kind of fire or smoke when he left the property, nor did he smell the odor of smoke.

{¶ 25} Chikela Cruse lived on East Fourth Street in June 2024.   She and her children lived in a single-family home across the street from the 2105 Property.   Around 3:00 a.m. on June 10, 2024, Cruse's daughter woke her up and said there was a house on fire.   Cruse could see the flames, and someone knocked on her door and told them to get out of the house.   Cruse and her family went outside to the backyard.   The fire was very hot, and the property across the street was engulfed in heavy flames.   They went to the backyard because it was too hot to be in the front yard and there were embers flying over the house. The whole street was filled with smoke.   After the fire was extinguished, Cruse saw that the front of her home had melted.   Other houses on her street were melted too.   The damage to the houses was not there prior to the fire.

{¶ 26} Andrew Warner, a parole officer for the State of Ohio, was assigned to monitor inmates sentenced to post-release control in Montgomery County, Ohio.  In June 2024, Warner was assigned as the parole officer for Dennis Mills.   Based on a communication he received from Mills in early June 2024, Warner connected Mills with fire investigator Baughman.

{¶ 27} Due to Mills's conviction as a sex offender and the fact that he was homeless, Mills was required to be on GPS active monitoring.   Warner tracked Mills's movements via GPS through an ankle monitor, which "pinged," or verified, Mills's location every 30 seconds. The GPS location tracking was usually accurate to within 30 feet.

{¶ 28} Warner accessed Mills's GPS information online and ran a report for Mills's whereabouts from June 1, 2024, to July 9, 2024.   On June 5, 2024, Mills was pinged at the

9

2105 Property multiple times. On June 9, 2024, Mills was pinged near the Family Dollar at 2601 East Third Street at 7:32 p.m. and again at 9:42 p.m. Beginning at 1:38 a.m. on June 10, 2024, Mills was located at a residence on East Fifth Street where he stayed for 8 hours and 35 minutes.

{¶ 29} Dayton Firefighter Zachary Horstman testified that he responded to the June 10, 2024 fire at the 2105 Property. Upon turning onto Fourth Street several blocks away from the scene, he could see the flames above the trees and houses. The 2105 Property was fully engulfed in flames by the time the firefighters arrived, so they attempted a defensive attack, meaning that it was too dangerous to enter the property and that they were going to spray water on the exterior of the structure. When Horstman got out and turned the corner around the fire truck, he was struck with radiant heat from the fire that was so hot that it burned his left hand despite wearing full protective fire gear. He was later taken to the hospital for his burn.

{¶ 30} Although the firefighters' main focus was the 2105 Property, there were multiple fully engulfed structures. The active fire went all the way across from 2101 and 2103 East Fourth Street ("2101 Property") to 2109 and 2111 East Fourth Street ("2109 Property"). The 2105 Property partially collapsed in the front yard. The firefighters then focused on the structure at the 2109 Property, which was fully engulfed. An aerial water gun was used to shoot water into the 2101 Property through the roof to try to knock down that fire.

{¶ 31} Due to the radiant heat, the siding had started to melt on the structures next to the fire and on three of the structures across the street, so the firefighters doused water on those structures, too. The fire engine also started to melt so it was moved, and the neighboring homes were evacuated.

10

{¶ 32} Muhammad Kahn was the owner of the company EYGYLC, which purchased the 2105 Property and 2109 Property (collectively "Fourth Street Properties") on October 6, 2020. The two properties were purchased for $15,000. Neither property was inhabitable at that time, so Kahn intended to fix them up to sell or rent out. Due to the Covid pandemic, there was a delay in starting work on the properties and work did not begin until the end of 2023 or early 2024. Kahn first fixed the roofs on both properties, which cost around $16,000 or $17,000. He also started to clear out the properties and do demolition work on the interiors.

{¶ 33} In 2024, Kahn had a permit to allow people associated with the work at the 2105 Property to be inside the premises because it was boarded up and deemed uninhabitable. People were allowed to be inside the property only during certain hours. Ernie DuBose was a contract laborer for Kahn, who worked mainly on the exterior of the home. DuBose mowed the yard and made sure no one entered the property and left trash. DuBose did work for Kahn on some of his other properties too. Dennis McCarthy did cleaning for Kahn at the East Fourth Street properties as well. Kahn had enlisted the help of homeless people to help clear out the building, but he did not know Fabian, Mills, Dalton, or Davis. Neither DuBose nor McCarthy had authority to subcontract on Kahn's behalf without his knowledge.

{¶ 34} In June 2024, the Fourth Street Properties were boarded up. The drywall had been taken out, and the structures had been cleared down to the studs to get ready for inspection. Kahn planned to get permits for electrical, mechanical, etcetera, but the structural inspection had not yet occurred. There was no gas or electrical power in the 2105 Property.

11

**{¶ 35}** On June 10, 2024, Kahn was out of the country with family and was notified that the properties had been damaged by fire. Kahn contacted DuBose that same day to check on the properties, which were burned to the ground.

**{¶ 36}** After the fire, the value of the properties was negative because to get the properties cleaned up, it would have cost more money than they were worth. Kahn did not have the Fourth Street Properties insured at the time of the fire. The structures were uninhabitable and high-risk because they were under construction, so insurance companies would not insure them. Kahn did not receive any compensation for the damage to his properties. In order for him to rebuild, he would have had to spend at least $10,000 to $12,000 just to excavate the old foundations before he could start rebuilding anything. In total, Kahn estimated that he lost more than $75,000 on the properties.

**{¶ 37}** Investigator Katy Baughman worked for the Dayton Fire Department and was previously a parole officer for the State of Ohio. Although she worked for the Dayton Fire Department, her position was associated with the Dayton Police Department investigating arson and fire crimes.

**{¶ 38}** As a parole officer, Baughman had supervised Dennis Mills. In June 2024, Mills contacted his new parole officer due to information he had and requested Baughman's contact information because he knew that she had become a fire investigator. On June 6, 2024, she and Mills had a conversation. Based on the information she received, Baughman worked overtime on Friday, June 7, 2024, surveying the area around the 2105 Property. Baughman canvassed the area of East Fourth Street and Van Lear, spoke with neighbors and people on the street, and surveilled the property. She did not notice anything suspicious during that time and ended her shift around midnight.

12

{¶ 39} In the early morning hours of June 10, 2024, Baughman was called out for a fire at the 2105 Property. The fire department was dispatched at 3:26 a.m. and Baughman arrived sometime before 4:00 a.m. By the time Baughman arrived, the firefighters were already on scene actively engaging the fires from the exterior. Families in the neighborhood had been evacuated from their homes due to the damage the fire was causing to nearby homes.

{¶ 40} The fire had fully overtaken the 2105 Property, which was in the middle of the 2101 Property and 2109 Property. The 2105 Property collapsed and was consumed by the fire, which had travelled to the properties on either side of it. The Fourth Street Properties were primarily wooden structures, and their interiors had been renovated down to the studs. The 2101 Property was a multi-family structure on the corner of Van Lear and East Fourth Street. It had a brick veneer and a "fuel load," such as furniture and other property inside the building, and therefore it did not burn as quickly as the other two properties. That property, too, was unoccupied and under construction. Although the structures on either side of the 2105 Property were also engulfed in flames, the exterior sides of those neighboring properties were the least burnt, indicating that the fire had originated from the center, the 2105 Property. Additionally, the brick building had a U-shaped burn pattern to it indicating that the fire spread into the 2101 Property from the 2105 Property. All three properties were almost completely consumed by the time the fire was put out. The fire department remained on scene actively putting out the fire until 2:30 p.m. on June 10, 2024. Some rekindling of the same fire occurred later that night, for which the fire department briefly returned.

13

{¶ 41} Due to reports that someone had been seen regularly at the property, there were concerns that someone may have succumbed to the fire. However, human remains dogs did not alert to any possible victims after the fire was out.

{¶ 42} The 2105 Property structure was so severely damaged that it was inaccessible and unsafe to access even after the fire was extinguished. There was no physical evidence recovered to verify whether an accelerant was used. However, an accelerant could have consisted of a flammable liquid, or it could have been as simple as paper. Had paper been used, it would have been entirely consumed during a fire and left no evidence. Without conducting an interior scene exam, Baughman was unable to pinpoint a specific origin of the fire beyond identifying the building of origin. Baughman testified that the building of origin of the fire was the 2105 Property. Though the 2109 Property was significantly damaged, there were more structural components still intact there compared to the 2105 Property. Although severely damaged, the 2101 Property was less burned than the other two structures due to the additional fuel load inside the building and the brick veneer. According to Baughman, fires burn up and out, and the U-pattern of the fire in the three buildings indicated the origin of the fire was in the middle structure, the 2105 Property. Further, on the opposite side of the street, the melted vinyl siding on the houses mirrored the U-shaped fire pattern of the burned houses that were adjacent to the 2105 Property, and the property directly across from the 2105 Property had more significant damage.

{¶ 43} Baughman explained that possible causes of a structure fire include accidents, such as a malfunctioning electrical system or candles knocked over; natural causes, such as a lightning strike; and intentional causes, such as arson. On the night of the fire, the weather was dry and there was no rain, storms, or recorded lightning strikes. The

14

2105 Property did not have gas or electricity connected and did not contain any working appliances.

{¶ 44} The houses and buildings surrounding the three properties that burned were mainly built with vinyl siding. Due to the radiant heat from the fire, the vinyl sidings had melted and were dripping off the buildings. Some of the properties were homes in which people resided and had been evacuated during the fire. There was also a business on the corner across the street from the 2101 Property and a detached garage at 56 South Van Lear Street that suffered damage to the vinyl sidings.

{¶ 45} Baughman took several photographs of the damage caused by the fire, which were submitted at trial. She attempted to obtain doorbell videos or other surveillance video from the neighbors in the area but was unsuccessful in finding anything relevant to the fire. Baughman did not observe Fabian or any other individuals in the area on video between midnight and 3:30 a.m. She obtained the surveillance video from the Family Dollar store at 2601 East Third Street, which was about a half a mile away from the Fourth Street Properties. She estimated that the distance between the two would have been about a five- to seven-minute walk.

{¶ 46} Baughman obtained a copy of the photograph DuBose took, and she tracked down Dalton. She also interviewed Davis. She developed Fabian as a suspect and interviewed him on June 12, 2024. Fabian's interview was played for the jury.

{¶ 47} In his interview, Fabian stated that he lived at the 2105 Property near Fourth Street and Van Near and was working for a guy named "Dennis" from California. Fabian said that about two weeks before the fire, there were people stealing copper from the house, and he told Dennis about it. Although he did not disclose to Dennis who the people were, one of them was Dalton. Dennis asked Fabian to stay at the house and keep an eye on it.

15

Fabian was getting paid by Dennis, and he worked at the house for four or five days to have a place to stay. Nobody was staying at the house with Fabian, but his friends would stop by and hang out or work for a few minutes.

{¶ 48} On Sunday, June 9, 2024, Fabian had been working at the 2105 Property by himself, but Dalton came by to verify that Fabian would not tell anyone that Dalton had stolen some copper from the house. Mills also stopped by the house that day, but according to Fabian, Mills had left before two men showed up and told Fabian to get out of the house. The men said they worked for the "main guy" and that Fabian would not be paid. Fabian got his things together and left. Fabian hypothesized that he could have started a fire accidentally when he left because he threw down his lit cigar that was near a pile of trash. But he denied seeing a fire or anything burning and claimed that if he had, he would have put it out. Fabian repeatedly stated that he did not intend to start a fire.

{¶ 49} Fabian claimed that when he left the 2105 Property, he went to a wooded area and slept there with his friend "Tex," a.k.a. Davis. Fabian stated that he and Davis hung out at the Family Dollar parking lot for a little bit but then went back to the field. Fabian said that he went to sleep around 9:00 p.m., was in his spot all night, and got up the next morning around 8:00 or 8:30 a.m.. He later admitted that sometime that night, he went to the side of 56 Van Lear, where he loaded up his water jug outside the house. This was approximately 100 feet away from the 2105 Property, though Fabian denied going back into the 2105 Property.

{¶ 50} Fabian admitted that he smoked cigarettes inside the 2105 Property but stated that he put them out in cans. He extinguished them a couple of times on the floor but was not aware that he burned anything. Fabian denied that he accidentally or intentionally set

the house on fire or that he was offered money to burn the house down. At the conclusion of the interview he stated, "[M]y God," and "I'm so sorry." Tr. 363.

{¶ 51} The jury found Fabian guilty on three counts of arson (harm to property of another having a value of $1,000 or more), fourth-degree felonies. These offenses related to the 2101 Property and the Fourth Street Properties. Fabian was found not guilty on the remaining counts.

{¶ 52} On July 9, 2025, Fabian was sentenced to a stated prison term of 18 months on each count of arson. The first two prison sentences were ordered to be served consecutively to each other but concurrent to the third prison sentence. Fabian's sentences were ordered to be served concurrently to his prison sentences in two other unrelated felony cases, for a total aggregate prison term of 36 months. Fabian timely appealed.

## II. Sufficiency of the Evidence

{¶ 53} Fabian's first assignment of error states:

APPELLANT'S THREE CONVICTIONS FOR ARSON ARE BASED UPON INSUFFICIENT EVIDENCE.

{¶ 54} Fabian contends that the State failed to produce sufficient evidence of identity and further that there was insufficient evidence that the value of each of the properties was more than $1,000. We disagree.

{¶ 55} "When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law." *State v. Alcorn*, 2012-Ohio-5784, ¶ 5 (2d Dist.), citing *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist.2000). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven

17

beyond a reasonable doubt." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Jenks*, 61 Ohio St.3d 259 (1991) paragraph two of the syllabus.

{¶ 56} Each of the three arson offenses alleged were violations of R.C. 2909.03(A)(1), which provides: "No person, by means of fire or explosion, shall knowingly . . . [c]ause, or create a substantial risk of, physical harm to any property of another without the other person's consent." Under this statute, the crime is a first-degree misdemeanor unless the property's value is $1,000 or more. In that case, the crime is elevated to a fourth-degree felony. R.C. 2909.03(D)(2)(a) and (b).

{¶ 57} When a person is charged with a violation of R.C. 2909.03(A)(1) that involves "property value or an amount of physical harm of one thousand dollars or more[,] . . . the jury or court trying the accused shall determine the value of the property or amount of physical harm and, if a guilty verdict is returned, shall return the finding as part of the verdict." R.C. 2909.11(A). The statute does not require the jury "to find or return the exact value or amount of physical harm" but does set forth criteria that "shall be used" in determining the value of the property or physical harm. R.C. 2909.11(A) and (B). "The staff notes to R.C. 2909.11 state that the determination of the value of the loss need not be precise because the purpose of the value of the incurred damage is not to award damages, but to ascertain the extent of the crime and the appropriate degree of felony that correspondingly should apply." *State v. Williams*, 2009-Ohio-6826, ¶ 20 (8th Dist.).

{¶ 58} R.C. 2909.11 provides three sets of criteria to determine value of property or amount of physical harm involved. The first, in R.C. 2909.11(B)(1), relates to heirlooms and does not apply here. The remaining criteria are as follows: "If . . . the physical harm is such that the property can be restored substantially to its former condition, the amount of

18

physical harm involved is the reasonable cost of restoring the property"; or if "the physical harm is such that the property cannot be restored substantially to its former condition, the value of the property, . . . in the case of real property or real property fixtures, is the difference in the fair market value of the property immediately before and immediately after the offense." R.C. 2909.11(B)(2) and (3).

{¶ 59} With regard to the Fourth Street Properties, Kahn testified that his company had purchased the two properties for $15,000 in October 2020. Since then, he had fixed the roofing on both properties, which cost an additional $16,000 or $17,000. He had also started to clear out the property and do demolition work on the interior. After the fire, the properties had a negative value because the cost of cleaning up the properties would have been more money than they were worth. Kahn testified that he would have had to spend at least $10,000 to $12,000 just to excavate the old foundations before he could start rebuilding anything. In total, Kahn estimated that he lost more than $75,000 for the two properties. Kahn's testimony was more than sufficient to show that the value of the physical harm to each of the Fourth Street Properties was $1,000 or more.

{¶ 60} While there was no specific testimony as to the value of the 2101 Property, there was testimony that it had been a multi-family housing unit that contained personal effects. Baughman testified that the 2101 Property had furniture and other property inside the building, which slowed the progress of the fire. The photographs of the 2101 Property, which we have reviewed, show extensive fire and smoke damage both inside the building and on the exterior brickwork. The remaining wooden beams were severely charred, brickwork throughout the building had caved in, and some of the interior walls had melted. Though the better practice would have been for the State to present evidence demonstrating the fair market value of the property before and after the fire, in this case, the photographs

were sufficient to establish that the $1,000 statutory threshold had been met. *See State v. Williams*, 2006-Ohio-4653, ¶ 24 (2d Dist.) (holding that photographs of the damage incurred could reasonably let the jury conclude that the physical harm to the property "would require a substantial amount of money to repair."). Kahn's testimony about the value of the adjacent properties provided further support for their verdict.

{¶ 61} There was also sufficient evidence presented to conclude that by means of fire or explosion, Fabian knowingly caused or created a substantial risk of physical harm to the property of another without the other person's consent, namely, the fires at the 2101 Property and the Fourth Street Properties. The evidence at trial established that in early June 2024, Fabian was homeless and was staying at the 2105 Property, which was a vacant multifamily home undergoing construction. The structure was boarded up, and the interior was stripped to the studs. On June 9, 2024, there was no electricity, gas, or power in the home and no appliances inside. Nor was there any kind of natural weather condition that could have caused a fire.

{¶ 62} Mills testified that on June 5, 2024, he was with Fabian at the 2105 Property. Mills's GPS tracker confirmed that he was at the residence on multiple occasions that day. Mills stated he heard a man meet with Fabian outside the house. When Fabian reentered the house, he told Mills that if he got rid of the property, they would be taken care of monetarily. Mills suggested making a firebomb using toilet paper. Fabian told Mills that he was going to finish taking out the wiring and copper before setting the house on fire, which he planned to do on Friday, June 7, 2024. Based on their conversation, Mills contacted Baughman on June 6, 2024.

{¶ 63} Although the fire did not occur on Friday, Mills met up with Fabian on Sunday evening, June 9, 2024, at the Family Dollar on East Third Street. Fabian told Mills he was

going to burn the property that night and asked Mills to come with him, but Mills declined. Mills's GPS verified that he was at the Family Dollar on the evening of June 9, 2024, and that he then went to a property near Fifth Street and Webster, where he stayed all night.

{¶ 64} Davis also testified that Fabian discussed getting rid of the 2105 Property and burning it down for insurance purposes. Davis saw Fabian around 2:30 a.m. on June 10, 2024, at the Family Dollar on East Third Street. Fabian told Davis that he had been run off the vacant property. Davis agreed to watch Fabian's cart while Fabian went to collect cigarette butts left in ash trays. At 3:19 a.m., Fabian returned to the Family Dollar via Third Street to collect his property. Davis noticed that Fabian was "different" and just wanted to lie down. Davis stated that Fabian smelled like a campfire, which was different than how he had smelled before he left the Family Dollar. Both Davis and Baughman testified that it would take seven minutes or less to walk from the Family Dollar to the Fourth Street Properties.

{¶ 65} Fabian also told his friend Dalton that the owner of the vacant property offered to pay Fabian to burn the place down so the owner could get insurance. On Sunday, June 9, 2024, Dalton and Fabian were at the 2105 Property collecting copper and using drugs together. Around 2:30 p.m. or 3:30 p.m., two men arrived in a pickup truck—later determined to be DuBose and his son—and kicked Fabian and Dalton out of the house. Fabian was very upset about getting kicked out of the house. When DuBose confronted Fabian and Dalton in the house and told them to leave, he photographed them. Fabian and Dalton went their separate ways after leaving the property.

{¶ 66} Although Cruse was unclear exactly when the fire started, she testified that around 3:00 a.m. on June 10, 2024, her daughter woke her up due to seeing the 2105 Property across the street on fire. The 911 call came in at 3:26 a.m., and the

21

firefighters responded shortly thereafter. By the time the firefighters arrived, all three of the vacant properties on East Fourth Street were consumed by flames, with the most damage to the 2105 Property. The 2105 Property was determined to be the fire's origin.

{¶ 67} Fabian stated during his interview that once he was kicked out of the 2105 Property, he did not return. He initially claimed that he stopped by the Family Dollar and then spent the whole night in a wooded lot with Davis. However, he later said that he went to the house behind the vacant property sometime that night to get water, which placed him within 100 feet of the 2105 Property. Although no surveillance cameras captured Fabian in the area of the fire, or anyone else for that matter, Fabian could have accessed the property from the rear after stopping to get water, in which case Baughman explained that Fabian would not have been visible on any of the surveillance cameras.

{¶ 68} While the evidence was circumstantial, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155 (1988). Further, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991), citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

{¶ 69} Fabian told multiple people that he was going to burn the house down and elicited assistance to do so. He had just been kicked out of the home hours before the fire and was angry about not getting paid. When Fabian returned to the Family Dollar at 3:19 a.m., he smelled like a campfire, something he had not smelled like before he left the store around 2:30 a.m. The distance between the Family Dollar and the 2105 Property was

22

approximately a five- to seven-minute walk, leaving ample time for Fabian to start a fire and return to the store. Additionally, Fabian placed himself approximately 100 feet away from where the fire started during the night.

{¶ 70} Viewing this evidence in the light most favorable to the State, we conclude that the jury could reasonably have found that Fabian knowingly set fire to the 2105 Property, which naturally and foreseeably spread to the two adjacent properties. Further, the jury could reasonably have found that the value of the damage for each of the three properties was $1,000 or more. The three unoccupied residential properties were completely consumed by the fire and required not only clean-up but completely new structures to be built. Fabian's first assignment of error is overruled.

### III. Manifest Weight of the Evidence

{¶ 71} In his second assignment of error, Fabian states:

APPELLANT'S THREE CONVICTIONS FOR ARSON ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 72} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Robinson*, 162 Ohio St. 486, 487 (1955). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis in original.) *Id*., quoting *Black's Law Dictionary* (6th Ed. 1990). When an appellate court reviews whether a conviction is against the manifest weight of the evidence, the court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and

23

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Williams*, 2021-Ohio-1340, ¶ 101 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 73} Fabian contends that his convictions are against the manifest weight of the evidence because he denied culpability and the witnesses who testified against him, particularly his alleged friends, were not credible. Fabian does not point to any specific inconsistencies regarding the witnesses' credibility, but rather he alleges that because some of the witnesses had criminal histories, they were not credible. Each of the witnesses answered questions regarding their criminal history during their direct and cross-examinations, including inquiries regarding any benefit the witnesses received for testifying on behalf of the State or any potential bias they may have had. The jury, as the trier of fact, was able to judge the credibility of the witnesses and was "free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Grant*, 2020-Ohio-3055, ¶ 50 (2d Dist.), citing *State v. Wright*, 2002-Ohio-4279, ¶ 25 (8th Dist.). The jury did not lose its way simply because it chose to believe the State's witnesses and disbelieve Fabian, which it was entitled to do. *State v. White*, 2005-Ohio-212, ¶ 69 (2d Dist.). Having reviewed the

24

record, we cannot conclude that the evidence weighs heavily against a conviction, that the jury lost its way, or that a manifest miscarriage of justice has occurred.

{¶ 74} Fabian's second assignment of error is overruled.

### IV.    Ineffective Assistance of Counsel

{¶ 75} In Fabian's third assignment of error, he claims:

APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL BY

NOT REQUESTING A JURY INSTRUCTION FOR ACCIDENT.

{¶ 76} To establish ineffective assistance of counsel, the appellant must show, "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Hunter*, 2011-Ohio-6524, ¶ 36, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show such prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel." *State v. Blanton*, 2023-Ohio-89, ¶ 56 (2d Dist.), citing *Strickland* at 697.

{¶ 77} "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel." *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). "To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*., citing *Strickland* at 689 and *State v. Wickline*, 50 Ohio St.3d 114, 126 (1990). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v.*

25

*McDonald*, 2017-Ohio-8496, ¶ 59 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524 (1992). Generally, "the decision of whether or not to request a particular jury instruction is a matter of trial strategy and, for that reason, will not substantiate a claim of ineffective assistance of counsel." *State v. Ferrell*, 2020-Ohio-6879, ¶ 49 (10th Dist.), citing *State v. Glenn-Coulverson*, 2017-Ohio-2671, ¶ 56 (10th Dist.).

**{¶ 78}** Initially, defense counsel requested an accident instruction be given to the jury. Tr. 395. However, the following day counsel changed his mind and asked that the accident instruction not be given to the jury. Tr. 401. It is clear from the record that counsel's trial strategy was not to claim that Fabian accidentally set the fire, but to claim that Fabian was not involved in setting the fire at all. Fabian's counsel maintained throughout the trial that Fabian did not start the fire. This position made sense given that the only evidence that arguably could have supported an accident jury instruction was Fabian's statement in his interview that he may have dropped a cigar in the house almost 12 hours before the firefighters were called to the scene of the fire. Even then, the scant evidence of accident was contradicted by other evidence that Fabian normally took care in safely extinguishing his cigarettes and cigars and that he had not seen a fire, observed any smoldering, or smelled the odor of smoke when he left the property. Trial counsel's decision not to request an instruction on accident was reasonable given that the instruction would have contradicted Fabian's defense. Selecting one defense to the exclusion of another is a sound trial tactic left to the discretion of counsel. Because counsel's decision not to request an accident instruction was a matter of trial strategy, it cannot form the basis of an ineffective assistance claim. *State v. Fletcher*, 2024-Ohio-5117, ¶ 76 (2d Dist.).

**{¶ 79}** Fabian's third assignment of error is overruled.

## V. Jury Instruction on Accident

{¶ 80} In his fourth assignment of error, Fabian makes the following argument:

THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY ON ACCIDENT.

{¶ 81} Fabian contends that the trial court should have included an instruction to the jury relating to the defense of accident despite defense counsel's request not to give it. Fabian concedes that he failed to object to the jury instructions as given and forfeited all but plain error. We find no plain error.

{¶ 82} A failure to object to jury instructions constitutes a waiver of that issue except for plain error. *State v. Jackson*, 92 Ohio St.3d 436, 444 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus. "Under this standard, the defendant bears the burden of 'showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16. We take notice of plain error with the "utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 83} "To be entitled to a jury instruction on accident, there must be evidence to support the argument that the appellant acted lawfully and that the result was unintended." *State v. Jones*, 2005-Ohio-1208, ¶ 21 (2d Dist.), citing *State v. Ross*, 135 Ohio App.3d 262, 276-277 (12th Dist.1999). "When accident has been raised as a defense, with a supporting record, a court errs when it refuses to charge the jury on that issue." *State v. Smith*, 1996 WL 239823, *8 (2d Dist. May 10, 1996), citing *State v. Brady*, 48 Ohio App.3d 41 (11th Dist. 1988), paragraph one of the syllabus. "Nevertheless, even if a trial court errs in failing to provide a jury instruction on the accident defense, if the court's general charge was

27

otherwise correct, it is doubtful that this error of omission would ever satisfy the test for plain error by affecting the outcome of the trial." (Cleaned up.) *State v. Deaton*, 2017-Ohio-7094, ¶ 21 (2d Dist.).

**{¶ 84}** Here, the trial court provided proposed jury instructions that included an accident instruction at Fabian's request, but Fabian's counsel later explicitly requested the trial court not give the accident instruction. "Under the invited-error doctrine, a party cannot take advantage of an error that the party invited or induced the court to commit." *State v. LaMar*, 2002-Ohio-2128, ¶ 102, citing *State v. Bey*, 85 Ohio St.3d 487, 492-493 (1999). Invited error has been found "when a party has asked the court to take some action later claimed to be erroneous, or affirmatively consented to a procedure the trial judge proposed." *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000). Under the invited-error doctrine, Fabian cannot now claim error by the trial court in granting his request to not give the accident instruction.

**{¶ 85}** Even if Fabian had not invited the trial court's alleged error, we cannot find plain error. "Accident" is defined as a result "that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event, out of the usual order of things and not reasonably (anticipated) (foreseen) as a natural or probable result of a lawful act." *Ohio Jury Instructions*, CR § 421.01(2) (2025). "[T]he defense of accident is not an excuse or justification for the admitted act; it is a complete denial that an unlawful act was committed because the defendant did not have the requisite mens rea." *State v. Crawford*, 2016-Ohio-7779, ¶ 17 (8th Dist.), citing *State v. Poole*, 33 Ohio St.2d 18, 19 (1973). "Thus, the accident instruction simply reminds the jury that the defendant presented evidence of accident to negate the defendant's criminal intent. If the jury believes the defendant's accident argument, it would be required to find the

28

defendant not guilty pursuant to the court's general instructions." (Citation omitted.) *Id.,* citing *State v. Sunderman,* 2008-Ohio-3465, ¶ 27 (5th Dist.).

{¶ 86} The record in this case reflects that there was little to no evidence introduced that the fire was accidentally set. During Fabian's interview with Baughman, he stated that when he was kicked out of the 2105 Property on the afternoon of June 9, 2024, he was angry and threw down his lit cigar to the ground where there was a trash pile. However, Fabian did not see a fire or observe any smoldering. DuBose likewise testified that he did not observe any kind of fire or smoke when he left the property, nor did he smell the odor of smoke. During his interview, Fabian denied that he accidentally or intentionally set the house on fire but admitted that it was possible he accidentally did it.

{¶ 87} The State's argument at trial was that Fabian set the fire between the time he left the Family Dollar around 2:30 a.m. and when he returned around 3:19 a.m. smelling like a campfire, not when Fabian left the house around 3:00 p.m. on the afternoon of June 9, 2024. Fabian denied that he returned to the property once he was kicked out or that he started the fire that night.

{¶ 88} The trial court's general charge to the jury included instructions for arson, which included the mens rea of "knowingly." The trial court also instructed the jury that the State bore the burden of proving every element of each of the charged offenses by proof beyond a reasonable doubt. Even without a specific instruction on the defense of accident, the jury was free to consider that Fabian accidentally started the fire when he threw down his cigar and to acquit him on that basis, but they did not. We cannot conclude that the outcome at trial would have been different had the accident instruction been given, and therefore, plain error is not found. Fabian's fourth assignment of error is overruled.

## VI. Conclusion

**{¶ 89}** Having overruled all the assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J., and HUFFMAN, J., concur.